**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ANIKA HUNTE, AS ADMINISTRATOR
OF THE ESTATE OF ARIES PETERSON,
ANIKA HUNTE, INDIVIDUALLY, AND
DANE PETERSON, INDIVIDUALLY

                                             Civil Action No.: No. 3:20-cv-1626 (SRU)

                   Plaintiff,

Vs.


ABBOTT LABORATORIES, INC.

                   Defendants.

**AMENDED COMPLAINT**

     This amended complaint is filed pursuant to the order of the court. For the benefit of the court and the defendant, a red-lined copy of this amended complaint is attached hereto as Exhibit A.

**INTRODUCTION**

     1.    This action arises out of the death of a three-month-old baby, who spent the majority of those three months fighting a horrific and deadly disease caused by cow's milk-based infant formula and/or fortifier.  Necrotizing Enterocolitis ("NEC"), is a deadly disease that largely affects low birth weight babies who are fed cow's milk-based formula or products.  Aries Peterson, a prematurely born, low birth weight baby, was fed *Similac Neosure*, *Similac Human Milk Fortifier* and *Similac Special Care*, and developed NEC shortly thereafter.  Plaintiff Anika Hunte brings this cause of action against Defendant for claims arising from the direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the

1

design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the product known as *Similac Neosure*, *Similac Human Milk Fortifier* and *Similac Special Care* (hereinafter collectively referred to as "Products").

**THE PARTIES**

2.　　Aries Peterson (the baby) ("Baby Aries") was born at Yale New Haven Hospital in New Haven, Connecticut on January 30, 2018.  He died on April 18, 2018 at Yale New Haven Hospital after developing Necrotizing Enterocolitis.  Baby Aries developed NEC within days of being fed *Similac Human Fortifier*, a cow's milk-based product, and within a day of being started on *Similac Special Care*.

3.　　Anika Hunte is the mother of Baby Aries.  Mrs. Hunte was duly appointed administrator of the Estate of Aries Hunte on September 10, 2020.  She brings this action as Administrator of the Estate of Aries Peterson.  Anika Hunte and Dane Peterson also bring this action in their individual capacity seeking damages for loss of filial consortium.

4.　　The defendant, Abbott Laboratories, Inc. manufactures, designs, formulates, prepares, tests, provides instructions, markets, labels, packages, places into the stream of commerce in all fifty states, including Connecticut, and sells premature infant formula including *Similac Neosure, Similac Human Milk Fortifier, and Similac Special Care*, and is a "product seller" in accordance with the Connecticut Products Liability Act (CPLA), Conn. Gen. Stat. Section 52-572m, et seq.

**JURISDICTION**

5.　　This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because

complete diversity exists between Plaintiff and Defendant, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

6.     This Court has personal jurisdiction over Defendant because Defendant is authorized to conduct and does conduct business in the State of Connecticut. Defendant has marketed, promoted, distributed, and sold the Products in the State of Connecticut and Defendant has sufficient minimum contacts with this State and/or sufficiently avails itself of the markets in this State through its promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

**BACKGROUND:**  **(The Science, The Marketing and The Baby)**

   A.     **The Science**

8.     According to the World Health Organization ("WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed, like Baby Aries. The WHO estimates that approximately 15 million babies are born preterm every year and that number is rising.

9.     Nutrition for preterm babies, especially those who have a very low birth weight (under 1500 grams) or extremely low birth weight (under 1000 grams), like Baby Aries (born at just 620 grams), is significantly important. Since the United States ranks in the top ten countries in the world with the greatest number of preterm births, the market of infant formula and fortifi-

ers is particularly vibrant.

10.     Originally, the cow's milk-based products were believed to be good for the growth of premature, low birth weight babies; however, science and research have advanced for decades confirming the significant dangers of the Defendant's cow's milk-based products in causing NEC and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other heath complications and long-term risks to babies, yet, the Defendant did nothing to change its product, packaging, guidelines, instructions, and/or warnings. Additionally, advances in science have created alternative formulas and fortifiers that are derived from human milk and non-bovine based products, however, the defendant continues to promote and sell cow's milk-based products.

11.     The brand name, Similac baby formula, was first launched by Abbott in 1951. Similac baby formula specifically designed for very low birth weight infants was first launched in 1978. Similac baby formula specifically designed for preterm babies was first launched in 1980.

12.     Science and research have advanced in recent years confirming strong links between cow's milk-based products and NEC and death in premature infants.

13.     As early as 1990, a prospective multicentre study on 926 preterm infants found that necrotizing enterocolitis was 6-10 times more common in exclusively formula-fed babies than in those fed breast milk alone and three times more common than in those who received formula plus breast milk.  Babies born at more than 30 weeks gestation confirmed that necrotiz-

ing enterocolitis was rare in those whose diet included breast milk; it was 20 times more common in those fed formula only.  Lucas A, Cole T. *Breast milk and neonatal necrotising enterocolitis.* Lancet 1990; 336: 1519–1523.

14.     In a study published in 2007 it was reported: "The use of an exclusive HUM [Human] diet is associated with significant benefits for extremely premature infants <1259 g BW.  The benefits include decreased NEC rates, mortality, late-onset sepsis, PDA, BPD, ventilator days, and ROP.  Importantly, while evaluating the benefits of using an exclusive HUM-based protocol, it appears that there were no feeding-related adverse outcomes.  This study demonstrates that an exclusive HUM diet provides important benefits beyond NEC." Sisk, PM, et al. Early human milk feeding is associated with a lower risk of necrotizing enterocolitis in very low birth weight infants. (Journal of Perinatology 2007; 27:428-433.)

15.     A study published in 2010 established that when premature babies were fed an exclusive diet of mother's milk, donor milk, and human milk fortifier, these babies were **90% less likely to develop surgical NEC**.  Sullivan, S., et al, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotising Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products. (Journal of Pediatrics 2010; 156:562-7)*

16.     In 2011, the Surgeon General published a report titled The Surgeon General's Call to Action to Support Breastfeeding, warning that **"For vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis (NEC)."** U.S. Department of Health and Human Services. The Surgeon General's Call to Action to Support

Breastfeeding. Washington, DC: U.S. Department of Health and Human Services, Office of the Surgeon General; 2011, p. 1.  This same report stated that premature infants who are not breast-fed are 138% more likely to develop NEC.  Id., Table 1, P.2.

17.    In 2012 the *American Academy of Pediatrics* issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of cow's milk-based formula.  The Academy stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk. . . If the mother's own milk is unavailable . . .  pasteurized donor milk should be used." Pediatrics 2012; 129:e827-e841, *Breastfeeding and the Use of Human Milk*.

18.    A study published in 2013 showed that <u>all</u> 104 premature infants participating in the study receiving an exclusive human-milk based diet <u>exceeded</u> targeted growth standards and length and HC gain (weight and head circumference).  The authors concluded that "this study provides data showing that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet."  Hair, A, et al, BMC Research Notes 2013, 6:459, *Human milk feeding supports adequate growth in infants  and HC gainbirthweight.* Thus, inadequate growth was proven to be a poor excuse for feeding cow's milk-based formula.

19.    In another study published in 2013 it was reported: "This is the first randomized trial in EP [Extremely Premature] infants of exclusive HM [Human Milk] vs. PF [Preterm Formula].  The significantly shorter duration of TPN and lower rate of surgical NEC support major changes in the strategy to nourish EP infants in the NICU." Cristofalo, E.A., et al, Randomized

trial of *Exclusive Human Milk versus Preterm formula.* (J Pediatr 2013 Dec; 163(6): 1592-1595.)

20.     In another study published in 2014, it was reported: "Necrotizing enterocolitis (NEC) is a devastating disease of premature infants and is associated with significant morbidity and mortality.  While the pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk." Good, Misty, et al., *Evidence-Based Feeding Strategies Before and After the Development of Necrotizing Enterocolitis.*  (Expert Rev Clin Immunol.  2014 July; 10 (7): 875-884.)  In that same study it was reported: "Necrotizing enterocolitis (NEC) is the most frequent and lethal gastrointestinal disorder affecting preterm infants [1,2], and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and death.  NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies [1-3]  The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease [3,4]." "A wide variety of feeding practices exist on how to feed the premature infant in the hopes of preventing necrotizing enterocolitis. There have been several meta-analysis reviewing the timing of administration and rate of advancement of enteral feedings in the premature infant as reviewed above, but there is no consensus on the precise feeding strategy to prevent this disease. The exclusive use of human breast milk is recommended for all premature infants and is associated

7

with a significant decrease in the incidence of NEC [11–13]. By determining the specific ingredients in breast milk that are protective against NEC, it is our hope that this devastating disease will one day be preventable."

21.      In yet another study published in 2014 it was reported: "An exclusive human milk diet, devoid of CM [Cow Milk] -containing products was associated with lower mortality and morbidity in EP [Extremely Premature] infants without compromising growth and should be considered as an approach to nutritional care of these infants." Abrams, Steven, et al. *Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products.* (Breastfeeding Medicine.  2014, Nov. 4, 9(6):281-286.)

22.      A 2016 study supported previous findings that an exclusive human milk diet in extreme premature infants dramatically decreased the incidence of both medical and surgical NEC.  This was the first study to compare rates of NEC after a feeding protocol implementation at multiple institutions with multiple years of follow-up using an exclusive human milk diet, and as a result was a very large study.  The authors concluded that "the use of an exclusive HUM [human milk] diet is associated with significant benefits for extremely premature infants" and "while evaluating the benefits of using an exclusive HUM-based protocol, it appears that there were no feeding-related adverse outcomes."   Hair, et al, *Breastfeeding Medicine 2016, 11-2, Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk-Based Diet.*

23.      In an article published in 2017, it was reported: "In summary, HM  has been

acknowledged as the best source of nutrition for preterm infants and those at risk for NEC.  Two

RCTs on preterm infants weighing between 500 and 1250 g at birth compared the effect of

bovine milk-based preterm infant formula to MOM or DHM on the incidence of NEC.  Both

trials found that an exclusive HM diet results in a lower incidence of NEC."  Shulhan, Jocelyn,

et al *Current Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products.* (Adv. Nutr. 2017; 8:8—0-91.)

     24.     In another study published in 2017, supported by prior data, it was reported:

"Human milk is the preferred diet for preterm infants as it protects against a multitude of NICU

challenges, specifically necrotizing enterocolitis…Preterm infants are susceptible to NEC due to

the immaturity of their gastrointestinal and immune systems. An exclusive human milk diet

compensates for these immature systems in many ways such as lowering gastric pH, enhancing

intestinal motility, decreasing epithelial permeability, and altering the composition of bacterial

flora. Ideally, preterm infants should be fed human milk and avoid bovine protein. A diet

consisting of human milk-based human milk fortifier is one way to provide the additional

nutritional supplements necessary for adequate growth while receiving the protective benefits of

a human milk diet." Maffei, Diana, Schanler, Richard J, *Human milk is the feeding strategy to prevent necrotizing enterocolitis!* (Semin Perinatol. 2017 Feb;41(1):36-40.)

     25.     In summary, medical studies have clearly established that: (1) bovine milk based

infant formula substantially increases the risk of low birth weight / premature infants developing

Necrotizing Enterocolitis; and (2) growth and nutritional benchmarks can be reached or exceed-

ed in low birth weight / premature infants who are fed an exclusive human diet (mom's milk do-nor milk and a human milk derived fortifier such as Prolacta).  *Neosure, Similac Human Milk Fortifier* and *Similac Special Care* are all derived from cow milk, and are therefore are avoida-bly unsafe products.

B.    **The Marketing**

26.    Notwithstanding strong medical evidence establishing the extreme dangers that cow's milk-based products pose for premature infants, Abbott has marketed its cow's milk-based products as an equally safe alternative to breast milk, and indeed has promoted its prod-ucts as necessary for additional nutrition and growth.  The Defendant has specifically marketed its formula and fortifier as necessary to the growth and development of *premature infants*, when indeed its products pose a known and substantial risk to these babies.

27.    Defendant Abbott routinely offers free formula and other goodies in baskets given to moms by their OBGYNs before birth and after birth in hospital and medical clinics.  The impetus behind such efforts is to create brand loyalty, and create the appearance of "medical blessing" so that moms continue to use formula to feed their babies after they leave the NICU, at great expense to the parents, and substantial profit to Abbott.

28.    Abbott's practice of trying to get moms to choose formula over breast milk goes back decades.  The company has for decades promoted its product as more healthy, necessary for adequate nutrition, and the choice for the modern, sophisticated mother.  Their advertising has at times attempted to portray breast feeding as an inferior, less sophisticated choice.

29.    The World Health Organization (WHO) and United Nation's International Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address the international marketing of breast-milk substitutes.  The World Health Director concluded the meeting with the following statement: **"In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement."** (Baumslag & Michels, 1995, p. 161).  Recognizing the abuse and dangers of the marketing of Infant formula, in 1981, the World Health Assembly (WHA; the decision-making body of the world's Member States) developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, and outlawed any advertising or promotion of breast milk substitutes to the general public.  The International Code of Marketing of Breast-milk Substitutes specifically prohibited advertising in Article 5 Section 1: "There should be no advertising or other form of promotion to the general public..." The International Code of Marketing of Breast-milk Substitutes. Geneva: World Health Organization, p.16 - 20 (1981).

30.    Abbott has acknowledged the Code: "We support, educate and encourage mothers to breast-feed for as long as possible, including, where possible, exclusive breast-feeding during the first six months of life and continued breast- feeding up to and beyond two years of age. . . We acknowledge the importance of the World Health Organization's 1981 International Code of Marketing of Breast-Milk Substitutes (the "WHO Code") and subsequent World Health Assembly (WHA) resolutions. We respect the aim and principles of the WHO Code to contribute to the provision of safe and adequate nutrition for infants, by: a) the protection and promo-

tion of breast-feeding; and b) ensuring the proper use of Breast-milk Substitutes, when these are necessary, on the basis of adequate information and through appropriate marketing and distribution." *Abbott Policy on the Marketing of Instant Formula.*

31.     Despite this assurance and warranty contained in its Policy, Abbott has systematically violated the Code's most important provision:  "There should be no advertising or other form of promotion to the general public..."

32.     Notwithstanding the Code of Marketing of Breastmilk Substitutes, and Abbott's purported commitment to the Code, advertising of infant formula has remained pervasive and widespread in the United States. Defendant Abbott aggressively markets and continues to advertise directly to the new parents by suggesting that by buying these products, they will benefit their newborns and give them the very best chance of survival. The pervasive marketing involved, ostensibly prohibited by the Code, has impacted the perceptions of synthetic non-human milk derived substitutes, such as formula and fortifier, in such a way that it lessens the likelihood that a parent of a baby receiving this food in the NICU will ask questions, query about alternatives, or object to its ingestion. In short, Defendant Abbott has systematically violated the Code's central provision.

33.     Similac was deceptive from its very inception.  Similac's very name (*i.e. similar to lactation*) is deceptive.  Beginning with its brand name, Abbott has continued to perpetuate the deception that its product is on par with or similar to human milk. This marketing has altered the perceptions of parents and directly contradicts the medicine and the science.

34.     One study reports that, "Since the late 19th Century, infant formula manufactur-

ers have encouraged mothers to substitute formula for breastmilk." *Rosenberg KD, Eastham CA, Kasehagen LJ, Sandoval AP. Marketing infant formula through hospitals: the impact of commercial hospital discharge packs on breastfeeding. Am J Public Health. 2008;98(2):290-295*. The same study has also found that manufacturers have repeatedly used their relationships with hospitals and the discharge process to encourage mothers to substitute formula for breast milk even after they leave the hospital.

35.     Indeed, most hospitals in the U.S. distribute "commercial discharge bags packaged as smart diaper bags containing various coupons, advertisements, baby products, and infant formula samples." Yeon Bai, et al, *Alternative Hospital Gift Bags and Breastfeeding Exclusivity*, ISRN NUTR., article ID 560810:2(2013). These commercial gift bags send confusing signals to breastfeeding mothers and have been shown to negatively impact breastfeeding rates. Id. at 5. However, the practice continues since it is a very effective way to encourage potential formula customers, including the parents of preterm infants whom are encompassed within the company's overall marketing strategy.

36.     Similac routinely compares its products with human breast milk and attempts to create an equivalency.  For example, an advertisement for *Similac Advance* published on the back cover of American Baby Magazine, April 2004 issue made repeated references and comparisons to breast milk, and indeed the short ad uses the phrases **"like breastmilk" six times.** *See advertisement on next page*.  See also, Broussard Hyderkhan, A, *Mammary malfunction: a comparison of breastfeeding and bottle feeding product ads with magazine article content*, 2005.

The pervasive exposure by mothers to media, advertising and promotion equating human milk to breastmilk has the generalized impact of: (a) reducing lactation; (b) causing mothers to believe formula is comparable to breastmilk; and (c) reduces the capacity for informed consent and informed decision-making. Through long-term exposure to Abbott's advertising, Baby Aries mother had been conditioned and was caused to believe that Similac products are suitable alternatives to breastmilk and necessary supplements for low birth weight infants.



*S*imilac® Advance® can help develop both your baby's immune system and brain like breast milk.

(Kisses, hugs, and silly songs are up to you.)



Breastfeeding is recommended for its many benefits. If you choose to feed formula, ask your doctor about Similac Advance.



Only Similac Advance with DHA and ARA has both*:

- A patented blend of special breast milk nutrients called nucleotides, which has been clinically shown to help support the development of a baby's immune system like breast milk.

  *The clinical study showed immune cell development like breast milk. Whether this development provides immune protection like breast milk has not been shown. Breast milk also contains antibodies not found in infant formulas that are important for a baby's immune protection.*

- Published long-term clinical research showing brain development like breast milk.*

*S*o much like breast milk in so many ways.

*Among formulas with DHA and ARA; infants studied at 12 and 39 months of age. ©2004 Abbott Laboratories.
www.SimilacAdvance.com

37.     In addition to perpetuating the myth that Similac is *"like breastmilk"*, Abbott has also deceived the public into believing that Physicians believe Similac is an ideal choice for babies.

38.     Beginning in 1989, Abbott began using claims in its advertising that Similac was "first choice of more physicians."

39.     Although the claim did not specifically compare itself to breast milk, a plain interpretation of this claim is that physicians believe Similac is the "1st choice," naturally implying that it is superior even to breastfeeding.

40.     Beginning in 1995, Abbott began a heavy marketing campaign which featured "1st choice of Doctors" on all its infant formula product labels.

41.     A marketing report commissioned by Abbott in March, 1998 summarized consumer reactions to several informational advertising pamphlets on Similac.  The one stressing the "1st Choice of Doctors" claim scored highest in terms of consumers' likelihood of purchase. The report concluded: "Doctor recommendations and the `science' behind the formula appeared to drive purchase interest for this concept, as well as the other concepts tested," and use of similar pieces emphasizing the claim was "highly recommended."

42.     One study estimates that formula manufacturers spent $4.48 billion on marketing and promotion in 2014.  *Baker, P, et al, Global trends and patterns of commercial milk-based formula sales: is an unprecedented infant and young child feeding transition underway?  Public Health Nutrition, 2016.*

43.     The contradictory messages women receive from images, articles, and advertising

16

in doctors' offices, hospitals, and popular magazines imply that breastfeeding is unnecessary and difficult if not impossible to achieve" Hausman, B. L. (2000, Summer). *Rational management: Medical authority and ideological conflict in Ruth Lawrence's Breastfeeding: A guide for the medical profession*. Technical Communication Quarterly, 9(3), 271-289.

44.     One study found that direct-to-consumer advertising increased request rates of brand choices and the likelihood that physicians would prescribe those brands. Parker, R. S., & Pettijohn, C. E. (2003). *Ethical considerations in the use of direct-to- consumer advertising and pharmaceutical promotions: The impact on pharmaceutical sales and physicians. Journal of Business Ethics*, 48, 279-290.

45.     One study found that exposure to infant feeding information through media advertising has a negative effect on breastfeeding initiation.    *Merewood A, Grossman X, Chaudhuri J, Sadacharan R, Fein SB. Exposure to infant feeding information in the media during pregnancy is associated with feeding decisions postpartum. Paper presented at American Public Health Association 138th Annual Meeting & Exposition; November 2010; Washington, DC.*

46.     In a study on infant feeding advertisements in 87 issues of Parents magazine, a popular parenting magazine, from the years 1971 through 1999, content analysis showed that when the frequency of infant formula advertisements increased, the percentage change in breastfeeding rates reported the next year generally tended to decrease.  *Stang J, Hoss K, Story M. Health statements made in infant formula advertisements in pregnancy and early parenting magazines: a content analysis. Infant Child Adolesc Nutr. 2010;2(1):16-25.*

47.     The Stang study also found that Infant formula company websites, printed materials, coupons, samples, toll-free infant feeding information lines, and labels may mislead consumers into purchasing a product that appears equivalent or superior to human milk. This may induce reliance on a biased source for infant feeding guidance.  *Stang J, Hoss K, Story M. Health statements made in infant formula advertisements in pregnancy and early parenting magazines: a content analysis. Infant Child Adolesc Nutr. 2010;2(1):16-25.*

48.     Abbott has developed an advertisement campaign which attempts to create a perception of "mommy wars."  One advertisement, which received significant attention, *The Mother 'Hood* tries to depict a "mom war," where all the competing sides come together to save a baby at the end.  The ad is effective in so much as it is manipulative.  The advertisement, at one point depicts three "bottle feeding moms," and one of them proclaims:  "*Oh look, the breast police have arrived."*  The ad then depicts the "breastfeeding moms" with arrogant and superior appearing faces, and even disdainful mannerisms, with one of the moms proclaiming in a condescending voice, "100% breast fed - straight from the source," and a second mom grasping her breast in a profane manner.  The negative portrayal of breastfeeding moms is subtle, but powerful, and casts the breastfeeding moms as judgmental and nasty, while portraying the bottle-feeding moms as nurturing victims.

www.youtube.com/watch?list=RDJUbGHeZCxe4&v=JUbGHeZCxe4&feature=emb_rel_end

49.     Another advertisement titled "The Judgment Stops Here," a documentary-styled ad, is powerful and moving in that it shows moms coming together, putting aside judgment of each others' choices.  However, the ad is manipulative, deceptive and violative of the Code and

Abbott's own marketing Policy, in that it puts breast milk and formula on an even playing field, and attempts to chastise any judgment that might be cast in favor or what is clear scientific judgment.  In other words, the ad attempts to insulate Similac from criticism or judgment, when criticism is wholly appropriate from a scientific standpoint. https://www.facebook.com/Similac/videos/1126104447462943

50.      In an Abbott advertisement for a Similac product, the ad states "when you are ready to turn to infant formula, but you don't want to compromise, look to Pure Bliss by Similac.  *It's modeled after breast milk . . .* " www.youtube.com/watch?v=kRaHiTMyYXs

51.      Moreover, Abbott has also attempted to market its products specifically to *premature infants*, who are the infants at highest risk from the dangers of the product.

52.      In 1978, Abbott began marketing "Similac 24 LBW", specifically for premature infants, claiming that the product was "introduced to meet the special needs of premature infants."

53.      In 1980, Abbott began marketing "Similac Special Care" claiming it was the first low-birth-weight, premature infant formula with a composition designed to meet fetal accretion rates."

54.      In 1988, Abbott introduced and marketing Similac Special Care With Iron, claiming it "was the first iron-fortified formula for premature and low-birth-weight infants introduced in the US."

55.      As of 2016, Abbott marketed and sold seven products specifically targeting "Premature/Low birth-Weight Infants": Liquid Protein Fortifier, Similac® NeoSure®, Similac®

Human Milk Fortifiers, Similac® Special Care® 20, Similac® Special Care® 24, Similac® Special Care® 24 High Protein, Similac® Special Care® 30

56.     Upon information and belief, Abbott specifically targets parents of premature infants in their marketing.  For example, a Google search "feeding preemies formula" reveals a paid advertisement on the first page for *Similac NeoSure,* with the heading "For Babies Born Prematurely."  The web-based advertisement states "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development."  The advertisement further claims that it is "pediatrician recommended" and "#1 brand fed in Hospitals" and "backed by science."  The advertisement makes no reference to specialized needs pre-term infants have for human breast milk, and makes no mention of the risk of developing Necrotizing Enterocolitis.  Although it is unclear when the promotional effort began, it appears that it was at least as far back as July 24, 2015, which is the date of the first "customer review" on the website.

57.     At all relevant times, Abbott has a website "similac.com" where the mothers can choose the formula the corporation recommends.  The website has a tab that indicates "Need help choosing the right formula for your baby? Our Formula Finder can walk you through it".  The website prompts the question: "was your child born prematurely?"  If the mother clicks "yes," the website directs the mother to a page located at https://similac.com/formula-finder/baby-formula/similac-expert-care-neosure-premature.  Through this website, Abbott directs mothers of premature babies to use Similac NeoSure - a cow's milk-based formula.  The

page further indicates that the product is "For babies who were born prematurely.   Similac

NeoSure supports excellent growth in premature babies' gains in weight, length, and head cir-

cumference when compared to these gains in preterm babies fed term formulas."

58.     In this promotional website, there is no mention of the risk of necrotizing

enterocolitis.  The promotional web page expressly and implicitly represents that its cow's milk-

based products are safe for use with premature infants.  This is false and misleading.

59.     A consumer searching the following phrases on Google: (1) "Is formula healthy

for premature infants" or (2) "Is formula safe for premature infants" are shown paid advertise-

ments by Abbott, specifically for their product *Similac NeoSure*.

https://similac.com/baby-formula/similac-expert-care-neosure-premature?gclid=Cj0KCQjw-
uH6BRDQARIsAI3I-UeYjPowMASPfF9f0R0P7xM5BNJD-E-
6FxOrZtsxgCYhJ75AtliM8CwaAkltEALw_wcB&gclsrc=aw.ds.

60.     This webpage makes numerous representations specific to premature infants.  For

example, Similac "Promotes catch-up growth during your premature baby's first 12 months" and

states that "Your premature baby didn't get her full 9 months in the womb, so her body is work-

ing hard to catch up. During her first full year, feed her *Similac NeoSure*, a nutrient-enriched

formula for babies who were born prematurely, and help support her development."  There is no

reference on this page to the risks associated with Abbott's product in terms of causing NEC.

The promotional website misleads parents of premature infants to believe that Abbott's product

is optimal for premature infants.  This is false and misleading.

61.     An Abbott advertisement states that "whether you choose to formula feed or, to

supplement breast feeding with formula, you can be confident in the nourishment of Similac."

The representation to parents that they can be "confident" is in direct contradiction of the studies that indicate the cow's milk-based formula is dangerous to premature infants. Accordingly, it is false and misleading.

62.     The website of Abbott also has reviews from mothers whose premature infants were in the NICU, and they discuss how wonderful and safe the products are. There are no mother reviews discussing NEC or death. This is false and misleading, and is perpetuated by Abbott. Abbott has designed a plan to induce mothers to continue to purchase the product after leaving the NICU, at great expense.

63.     CBS news reported that Abbott paid mom bloggers to give positive reviews of Abbott products.

64.     Recognizing a shift in the medical community towards an exclusive human based diet for premature infants, Abbott began developing a product called "Similac Human Milk Fortifier". The name in itself is misleading in that it suggests that the product is derived from human milk. In fact, it is a cow's milk-based product. Canvasser, J., *et al.* Parent and Provider Perspectives on the Imprecise Label of "Human Milk Fortifier" in the NICU. *Nutrients* 2020, *12,* 720.

65.     Abbott has designed a systematic, powerful and misleading marketing campaign to deceive mothers to believe that: (1) cow milk formula and fortifier is safe; (2) cow-milk products are equal, or even superior, substitutes to breastmilk; and (3) Physicians  consider their cow's milk-based products a first choice. Similarly, Abbott has marketed its products for premature infants as necessary for "catch-up growth", and perfectly safe for premature infants,

despite knowing of the extreme risks posed by cow's milk-based products relative to the deadly disease of NEC with regard to premature infants and cow products.  Anika Hunte was exposed to this deception, and was caused to believe this deception, all which substantially contributed to her baby being fed the defendant's cow milk products.

66.     Members of the medical community, physicians, and hospitals, as well as the parents, relied upon the representations and advertising of the defendant, which categorically omit that their cow's milk-based products significantly increase the risk of NEC and death in premature infants, which contributed to the product being fed to Baby Aries.

### C.     <u>Baby Aries and the Product</u>

67.     Baby Aries was born extremely prematurely with a low birth weight of just over one pound (620 grams), at 27 weeks gestation.

68.     The baby was placed in the Neonatal Intensive Care Unit (N.I.C.U.) at Yale New Haven Hospital.

69.     Following the birth of Baby Aries, Anika Hunte (mother) successfully pumped her own breast milk, and produced a significant supply sufficient for her baby's nutrition.

70.     Early morning of February 16, 2018, Baby Aries was fed a combination of Breastmilk and *Similac Neosure*.  *Similac Neosure* is a cow's milk-based formula.

71.     By the evening of February 16, 2018, Baby Aries was noted to have a bloody stool.

72.     Baby Aries' mother and father had no knowledge that *Neosure* would increase the risk of their baby developing Necrotizing Enterocolitis.

73.     Similac promotes *Neosure* on its website and other mediums as a safe product, and one specifically needed by preemies for adequate growth.   See https://similac.com/baby-formula/similac-expert-care-neosure-premature.   A link on this page specifically promotes the claim that preemies need Neosure for "catchup growth".       https://similac.com/baby-development/preemie/nutrition-premature-babies.     This latter link specifically claims that "While breast milk is the best form of nutrition, your preterm baby's nutrient needs are greater than what breast milk alone can provide. Your baby's healthcare team may add to breast milk a "human milk fortifier" that is specially designed for babies born prematurely. It enhances mom's milk with extra protein, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development."   The effect of this representation is to cause the mother to believe that her breastmilk is insufficient for her premature infant.



# Specialized Nutrition For Premature Babies

## Preterm nutrition is a story of specialization



Since preterm babies start smaller, their "catch-up growth" will have to be faster than usual for the baby to become the same size as a full-term baby.

Babies born prematurely have specific nutritional needs throughout the first year as their bodies work hard to grow and develop. The right nutrition for premature babies helps them grow in ways you can see, such as weight, length, and head size. Nutrition is also vital for growth you can't see.

Whether you choose to breastfeed or use baby formula, after leaving the hospital, most preemies will benefit from nutritional supplementation or a specialized formula with nutrients that support brain, muscle, bone, and organ growth, and development of a strong immune system.

Similac® NeoSure® is clinically shown to help with catch-up growth. It supports excellent growth during baby's first year, providing increased protein, energy, vitamins, and minerals compared to term infant formula. This means extra calories for growth, as well as calcium and phosphorus for baby's growing bones.

The fat blend in Similac NeoSure is 25% medium-chain triglycerides, an easily digested and well-absorbed fat source.

Similac NeoSure supports better gains in weight, length, and head circumference when compared to standard infant formula.

Read more about the benefits of Similac NeoSure and our **NEW value-size can.** Learn more

74.     This same webpage contains a video, promoting the necessity of formula as a means to achieve adequate growth in premature infants.

https://similac.com/baby-formula/similac-expert-care-neosure-premature.

75.     All this marketing and promotion is designed to instill confidence in Abbott's product lines, and indeed to plant a subtle seed in a parent's mind that formula is safe and necessary to the growth of a premature infant.

76.     Prior to baby Aries being fed *Similac Neosure*, Anika Hunte was exposed and persuaded by marketing from Abbott that Similac products were safe and necessary to the growth and nutrition of her premature infant.

77.     Although Abbott promotes an aggressive marketing campaign designed to make parents believe that *Neosure* is safe and necessary for growth of a premature infant, the product is in fact extremely dangerous for premature infants.  *Neosure* substantially increases the chances of a premature infant getting NEC and of dying.

78.     *Neosure* is commercially available at retail locations and online.  No prescription is necessary.

79.     Despite knowing of the risk of NEC, Abbott did not warn parents of the risk of NEC  or death associated with *Neosure*.

80.     Despite knowing of the risk of NEC, Abbott did not warn doctors, hospital, nurses and medical staff of the risk of NEC or dying associated with *Neosure*.

81.     The only warnings contained are the following:

**Safety Precautions**

- **Never use a microwave oven to warm formula.** Serious burns can result.
- Powdered infant formulas are not sterile and should not be fed to premature infants or infants who might have immune problems unless directed and supervised by your baby's doctor.

\* *Increased protein, vitamins, and minerals compared to term infant formula.*

† *Compared to infants fed a formula without DHA and ARA in a clinical trial with Similac Special Care and Similac NeoSure infant formulas with iron; prior to the addition of lutein.*

‡ *Visual acuity measured at 4 and 6 months corrected age and assessed by VEP (visual evoked potential).*

§ *Based on a subset of infants in a post-hoc analysis.*

¶ *No significant difference has been shown between milk derived from rbST-treated and non-rbST-treated cows.*

1 *Carver JD, et al. Pediatrics 2001;107:638-689.*

2 *Groh-Wargo S, et al. Pediatr Res 2005;57:712.718.*

3 *O'Connor DL, et al. Pediatrics 2001;108:359-371.*

4 *Canfield LM, et al. Eur J Nutr 2003;42:133-141.*

5 *Schweigert FJ, et al. Eur J Nutr 2004;43:39-44.*

6 *Patton S, et al. Lipids 1990;25:159-165.*

7 *Rubin LP, et al. J Perinatol 2012;32:418-424.*

82.     On or about February 22, 2018, the product, *Similac Human Milk Fortifier*, was introduced to the baby and feeding of this product continued thereafter.

83.     Notwithstanding its name, *Similac Human Milk Fortifier* is not derived from human milk.  Rather, it is a bovine-derived product.

84.     *Similac Human Milk Fortifier* substantially increases the chances of a premature infant developing NEC.

85.     Baby Aries was fed *Similac Human Milk Fortifier* from February 22, 2018 through February 26, 2018.

86.     Baby Aries' parents were told by hospital staff that their baby would receive *Similac Human Milk Fortifier* as a supplement to mom's own breastmilk.

87.     Baby Aries' parents did not know that *Similac Human Milk Fortifier* was derived from cow's milk. The name, "Human Milk Fortifier" is misleading and causes consumers to believe that it is a human milk derived product.

88.     Baby Aries' parents did not know *Similac Human Milk Fortifier* put their baby at increased risk of NEC and death.

89.     The product, *Similac Human Milk Fortifier*, contained only the following packaging information guidelines, instructions and warnings:

## Similac® Human Milk Fortifier Concentrated Liquid

- Intended for premature and low-birth-weight infants as a nutritional supplement to add to human milk.
- Use under medical supervision.
- Small, convenient packet is designed for easy mixing.
- When added to human milk, meets the nutrient recommendations for the premature infant.[1]
- Commercially sterile and meets the ADA and CDC recommendation to use liquid for NICU feedings.[2,3,*]
- Packet is simple to open and mixes easier with human milk than powder.[4]
- Low iron level provides flexibility to add iron as needed.
- Halal.
- Kosher.



### Safety Precautions

- Add only to human milk - do not add water.
- This product is nutritionally incomplete by itself and is designed to be added to human breast milk.
- Additional iron may be necessary.
- Tolerance to enteral feedings should be confirmed by offering small volumes of unfortified human milk.
- Once enteral feeding is well established, Similac Human Milk Fortifier Concentrated Liquid can be added to human milk.
- **Never use a microwave oven to warm feedings. Serious burns can result.**

*\* American Dietetic Association and Centers for Disease Control and Prevention*

[1] *Klein CJ. J Nutr 2002;132(6):1395S-1577S.*

[2] *Centers for Disease Control and Prevention. Enterobacter sakazakii infections associated with the use of powdered infant formula—Tennessee, 2001. Available at http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5114a1.htm. Accessed March 10, 2016.*

[3] *Pediatric Nutrition Practice Group, Robbins ST, Myers R. Infant Feedings: Guidelines for Preparation of Formula and Breastmilk in Health Care Facilities. ed 2. Chicago: American Dietetic Association, 2011.*

[4] *Data on file, 2010. Abbott Nutrition Market Research, Abbott Laboratories, Columbus, Ohio.*

90.     Despite knowing that *Similac Human Milk Fortifier* increases the risk of NEC and death, Abbott did not warn the parents or the medical providers of NEC or death, nor did it provide any instructions or guidance on how to avoid NEC or death.

91.     On February 25, 2018, Baby Aries was first fed *Similac Special Care.*

92.     *Similac Special Care* is a cow's milk-based formula.

93.     Abbott promotes *Similac Special Care* to parents, physicians, hospitals and medical staff as a safe product, and one specifically needed by preemies for adequate growth.

94.     Upon information and belief, *Similac Special Care* is (or was) available for purchase directly by the consumer at the retail level.

95.     Despite knowing that *Similac Special Care* increases the risk of NEC and death, Abbott did not warn the parents or the medical providers of NEC or death, nor did it provide any instructions or guidance on how to avoid NEC or death.  The product, *Similac Special Care*, contained the following "precautions":

"Similac Special Care 20 - Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician"

"Similac Special Care 24 – Precautions:

• Very low-birth weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician"

"Similac Special Care 24 High Protein – Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be
slowed or discontinued.
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician

"Similac Special Care 30 – Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Use this product only after feedings of lower caloric density are well-established. For improved tolerance, it is best to increase caloric density slowly, by 2- to 4-Cal/fl oz increments
• Hydration status should be monitored
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician"

"Similac Special Care Premature 20 calorie and 24 calorie and High Protein - Precaution:
·       If signs of intolerance develop, slow feeding or discontinue.

·      Not intended for low-birth-weight infants after they reach a weight of 3600 grams (approx.. 8 lb) or as directed by a doctor."

"Similac Special Care Premature 30 calorie – Precaution:
·      Use once feeding tolerance is established
·      If signs of intolerance develop, slow feeding or discontinue.
·      Hydration status should be monitored
·      Not intended for low-birth-weight infants after they reach a weight of 3600 grams (approx.. 8 lb) or as directed by a doctor."

96.     Abbott does not warn the user, the parents, or the physicians that its products (*Similac Neosure, Similac Human Milk Fortifier* and/or or *Similac Special Care*) cause NEC or death, nor provides guidance on how to avoid NEC or death while using its products.

97.     The cow's milk-based formula products, *Similac Neosure, Similac Human Milk Fortifier* and/or *Similac Special Care* are dangerous to premature infants in that they significantly increase the risk that the baby will develop NEC.

98.     The cow's milk-based formula products, *Similac Neosure, Similac Human Milk Fortifier* and/or *Similac Special Care*, are dangerous to premature infants in that they significantly increase the risk that the baby will die.

99.     The defendant, Abbott failed to properly warn parents and medical providers that its products, *Similac Neosure, Similac Human Milk Fortifier* and/or *Similac Special Care*, can significantly increase the risk that the premature infant will develop NEC and/or death, failed to design said products such as to make them safe, and deceived the public, parents, physicians and medical staff into believing that the products were a safe and necessary alternative, supplement and/or and substitute to human milk.

100.     Despite knowing that its products were being fed to premature infants without the parents' informed consent, Abbott failed to require or recommend that Hospitals inform the parents of the significant risks, and to require that the consent of the parent be obtained prior to feeding it to babies.

101.     The defendant, Abbott Laboratories, Inc.'s cow's milk-based formula products did cause Baby Aries to develop NEC, which triggered severe intestinal disease and death to Baby Aries.

**Safer Alternative Designs**

102.     The products made from cow's milk, specifically for premature infants by Similac, are unsafe to premature infants and are avoidable for use in that there is human donor milk available and/or human milk derived fortifier products available made from human milk instead of cow's milk.

103.     *Neosure*, *Similac Human Milk Fortifier* and *Similac Special Care* are not "unavoidably unsafe" products.  Indeed, scientific knowledge and feasibility has for decades permitted the design of a product derived exclusively from human milk without diminishing its utility, safety and effectiveness.

104.     Since 2006, Prolacta Bioscience has manufactured and sold premature infant fortifiers and formulas which contain no cow's milk, but rather 100% human donor milk. This product is an example of a feasible alternative design.  These alternative designs provide all the necessary nutrition and growth that bovine formula provides, without the deadly effects.

32

105.    Based upon information and belief, Abbott was aware of the increased risk of NEC and death associated with its cow's milk based products and instead of warning of the dangers, or removing them altogether, Abbott has attempted to reduce the harmful effects of cow milk based products through research and design, but has stubbornly insisted on continuance of cow's milk as the foundation of its products.

106**.**    Abbott is aware of the increased risk of NEC associated with the use of cow's milk as opposed to human milk. As a result, Abbott has attempted to remedy its defective product by researching and developing products that mimic human milk by: a) creating probiotics which are similar to mother's milk, b) developing human milk oligosaccharides that are found in mother's milk, and c) attempting to hydrolyze cow's milk proteins to make them easier to digest and resist infection. Despite these developments, Abbott has continued to market and produce its cow's milk-based products without any instructions or warnings to reduce the risk of NEC in premature infants.

## COUNT ONE: (PRODUCTS LIABILITY AS TO ABBOTT LABORATORIES, INC.)

107.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Prior to January 30, 2018, the defendant, Abbott Laboratories, Inc. was aware, or should have been aware, that its products were not safe for use, as they were used, in the premature infant, Baby Aries, and that there existed an alternative design — yet it took no steps to prevent its use in such a situation.

109.   The defendant, Abbott Laboratories, Inc. did foresee, or should have

foreseen, that its products would be used, as they were in the case of baby Aries, and knew or

should have known, that such use would significantly increase the risk of NEC and death in Ba-

by Aries, yet it took no steps to prevent such use.

110.   The products, *Similac Neosure, Similac Human Milk Fortifier, and Similac Spe-

cial Care* were not safe to be used as they were in the case of Baby Aries and the defendant

knew or should have known they were unsafe, yet it failed to provide any instructions or guide-

lines on when and how its product would be safe to use in a premature infant like Baby Aries.

111.   The defendant, Abbott Laboratories, Inc, has marketed their products

as safe and beneficial for premature infants like Baby Aries.

112.   The defendant, Abbott Laboratories, Inc. has promoted their product for

extremely premature infants and claim its product increases the babies' weight and caloric intake

and its product is more beneficial than harmful.

113.   The Defendant Abbott Laboratories, Inc. has advanced the false premise to par-

ents, physicians and medical staff that human milk is not sufficient to meet the nutritional needs

of premature infants, and the equally false premise that their products are necessary as either

substitutes and/or supplements to human milk.

114.   Science and research have unequivocally established the dangers of the defend-

ant, Abbott's, cow's milk-based product in causing NEC and death in premature infants, yet the

defendant did nothing to change its product, packaging, guidelines, instructions and warnings.

115.     Science and research have unequivocally established the dangers of the defend-
ant, Abbott's, cow's milk-based product was causing NEC and death in premature infants, yet
the defendant did not conduct any testing, data analysis, or research to determine when its prod-
uct should not be used or when and how its product was safe for use.

116.     Scientific studies show that Abbott products should not be sold for use in
extremely premature infants, yet Abbott continued to market and sell its products under its ubiq-
uitous brand name "Similac" knowing it would be used on infants like Baby Aries and knowing
its product would significantly increase the risk of NEC and death in extremely premature in-
fants like Baby Aries and knowing that its marketing over decades had created a false sense of
safety to both doctors and parents.

117.     Abbott knew or should have known that its products would be used in the way it
was used on this baby.

118.     The way in which the Abbott products were fed to the baby was extremely dan-
gerous and caused an unreasonably high risk that the baby would develop NEC and die, yet Ab-
bott provided no detailed instructions or warnings to prevent or alter the way this product was
used.

119.     Despite learning that its products were linked to NEC and death, Abbott failed to
properly collect data from patients, parents, doctors and hospitals in order to develop evidence-
based strategies, instructions, and warnings to reduce or prevent its product from causing NEC
and death.

120.    Despite knowing its products were leading to NEC and death, Abbott took no steps to determine how or why its products were causing NEC or death.

121.    The defendant, Abbott Laboratories, Inc. has learned that its cow's milk-based products were causing NEC and death in premature infants, yet the defendants did nothing to change its products, packaging, guidelines, instructions and warnings.

122.    Despite knowing that its cow's milk-based products were causing NEC and death in premature infants, the defendant, Abbott Laboratories, Inc. did not conduct any testing, data analysis, or research to determine when its product should not be used or when and how its product was safe for use.

123.    Despite knowing that its cow's milk-based products were leading to NEC and death, Abbott took no steps to determine how or why its product was causing NEC or death, nor did it conduct a comprehensive risk management plan to combat the tragic end results of using its products.

124.    Despite knowing for many years that numerous scientific studies were showing horrible adverse affects of its Similac products in premature infants, the defendant Abbott failed to undertake a rigorous risk management plan, periodic safety update reports, periodic benefit-risk reports, and development safety reports.

125.    Despite knowing that its products were causing NEC and death in premature infants, the defendant, Abbott Laboratories, Inc. did not contact the FDA, NICUs, hospitals, and/or to inform them its product was linked to causing NEC and death.

126.    Baby Aries' parents, physicians and medical staff were never told that the formula could cause their baby to develop NEC and death.

127.    Baby Aries' parents, physicians and medical staff were never told that the formula could cause their baby to die.

128.    Baby Aries' parents, physicians and medical staff were never told of the studies showing cow's milk-based formula was extremely dangerous to their baby.

129.    Baby Aries' parents, physicians and medical staff were never told of the studies showing human donor milk was safer for their baby.

130.    Baby Aries' parents, physicians and medical staff were never told of the studies showing that an exclusive human milk diet is sufficient to meet all growth and nutritional goals.

131.    Despite knowing that its cow's milk-based products were causing NEC and death in premature infants, Abbott Laboratories, Inc. did not recommend or require hospitals, NICUs or physicians that they should discuss the risks of NEC or death with the parents.

132.    Despite knowing that its products were causing NEC and death in premature infants, the defendant, Abbott Laboratories, Inc. did not contact the FDA, NICUs, hospitals, and physicians to inform them its cow's milk-based product was linked to causing NEC and death.

133.    The parents were aware Similac products were being fed to their baby.

134.    Because the brand name "Similac" is marketed as safe and healthy and similar to breast milk, and is regularly sold in stores and used in hospitals, the parents did not question the

safety of the product.

135.    The parents had been strong advocates involved in their infant's care throughout his life.

136.    The parents wanted to know and desired to be participants in all decisions regarding the health and safety of their son and wanted to be provided an informed choice on all risks and benefits of medical care and treatment. Because Abbott willingly, pervasively, and directly persuaded Baby Aries' parents of the claimed safety and necessity of its product through direct-to-consumer marketing, the parents allowed Similac to be fed to their infant. Abbott was obligated to correct this misperception when it became scientifically established that the information it relayed was false and harmful.

137.    Had either one of the parents known of the significant risks of feeding Similac to their premature infant, they would not have allowed the products to be fed. Similarly, had either parent not been exposed to this pervasive marketing, convincing them of Similac's safety and necessity, they would not have allowed the product to be fed.

138.    Neither the hospital nor the physicians involved in the care of the infant informed either parent that Similac cow's milk-based products could significantly increase the risk of NEC or death in their infant.

139.    The hospitals and physicians involved in the infant's care never informed the mother or father that Similac cow's milk-based products could significantly increase the risk of NEC or death to their son.

140.    Neither the hospital nor the physicians provided a choice to the mother or the father to feed their premature infant cow's milk-based fortifier or formula. This practice of not telling the parents of the risks of feeding cow's milk-based Similac formula or fortifier is the common practice throughout the country. Abbott is aware of this practice and is aware that parents are rarely, if ever, informed.

141.    Defendant Abbott has known for many years that its premature infant products, Similac, are significantly increasing the risk of premature infants developing NEC and dying and are aware that hospitals and physicians around the United States are not informing the parents of this risk of NEC developing when fed their formula.

142.    Abbott knows that if they required or even requested the hospitals or doctors to obtain an informed consent regarding the risks of feeding their products to their premature infant patients, the parents would not allow Similac to be fed to their children.

143.    Abbott knows that if they required or even requested on their product labels that their premature infant formulas, Similac, should not be fed to a premature infant until the parent is warned and informed that feeding a product could significantly increase the risk of NEC or death, then the use of the Similac products would immediately plummet in hospitals across the country because the truth and the science would finally be brought to light, and the parents would not allow the products to be fed to their infant.  The brand name Similac would forever be associated with NEC and death to the detriment of the corporate image of Abbott.

144.    If the hospital or physicians had informed either parent, or if Abbott had required

or even requested the hospitals or physicians inform the parents that the Similac products for premature infants could significantly increase the risk of NEC or death to their daughter, the parents would not have allowed the cow's milk-based products to be fed to their infant and Aries Peterson would not have suffered NEC and would have survived.

145.   Abbott provides free or low-priced products to the hospital, which encourages the products to be overused with no warnings, instructions and/or consents.

146.   For decades, Abbott has known that there is a complete lack of communication between physicians and parents when it comes to the feeding of the defendant's Similac products to preterm infants. Abbott has done nothing to fix this dangerous practice of silence. Unfortunately the effect of this practice is that premature infants have been needlessly succumbing to NEC and dying after being fed the defendant's products and the parents have no idea why.

147.   Baby Aries parents, like most parents who have lost their child to NEC after being fed cow's milk-based fortifiers or formulas, were never informed why their child developed NEC, and the hospital and its staff never advised the parents of the probable cause being Similac. Despite many years of premature infants developing NEC or dying after being fed Similac, parents remain completely in the dark as to the cause of their child's injury or loss and are not told of the abundance of data linking Similac to NEC and/or death.

148.   The FDA requires manufacturers of prescription medications to study their medications and perform drug trials and collect data to determine the safety and efficacy of their drugs and to determine the likelihood of side effects and to continuously study the drug's use to

review adverse outcomes and create proper warnings and instructions; however because baby formulas, such as Similac, are not drugs, the manufacturer, Abbott is not adequately performing such trials or properly collecting data on when and how the formula should be fed. Despite knowing for decades that the products are significantly increasing NEC and/or death in premature infants, and are far more dangerous than most prescription drugs, Abbott has failed to stop or lessen NEC and/or death.

149.    If Abbott had performed the pharmacovigilance required by drug manufacturers for their premature infant formulas and fortifiers, these products would not have been fed to Aries Peterson and he would not have developed NEC and he would have survived.

150.    If hospitals and physicians had been provided full disclosure of the data and science regarding the risks of NEC and death, or when it occurs, or instructions on how to avoid that (as if it were a drug), or a statistical data-based risk-benefit analysis, or were required or requested by the manufacturers to inform the patient as is ethically required with drugs, then Similac would not have been fed to Aries Peterson and he would not have developed NEC nor died but would have survived.

151.    The manufacturer Abbott has known that their Similac products are significantly increasing the risk of NEC and/or death in premature infants and are aware that there are alternatives to their cow's milk-based formulas and fortifiers, such as human milk derived products, that would reduce the risk of NEC and/or death, yet they chose to continue to promote, market, and sell their products, causing thousands of premature infants to succumb to NEC and die.

152.     The defendant, Abbott Laboratories, Inc., is liable to the plaintiff under the Connecticut Product Liability Act, Conn. Gen. Stat. Section 52-572m, et seq. in one or more of the following ways:

A.  Failure to Warn and/or Instruct

      a.  The defendant knew or should have known that its cow's milk-based premature infant products would be used, as it was, on extremely premature infants like Baby Aries, yet it failed to properly warn hospitals, NICUs, doctors, parents and/or consumers that its cow's milk-based product significantly increases the risk of NEC and death in these babies; and/or

      b.  Was unsafe and/or contra-indicated for extremely premature infants and low birth weight babies like Baby Aries; and/or

      c.  Failed to provide proper instructions or guidelines or studies, or data on when and how to feed its products to premature infants in order to decrease the risk of NEC and/or death; and/or

      d.  Failed to insert a warning or instruction that parents needed to be provided an informed choice between the safety of human milk versus the dangers of the defendant's cow's milk-based product; and/or

      e.  Failed to provide instructions that parents and physicians that the defendant's products carried a significant risk that its cow's milk-based product could cause their baby to develop NEC and die; and/or

      f.  The warnings and instructions are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn on cow's milk-based formula significantly increasing the risk of NEC and death or providing any details on how to avoid such harm; and/or

      g.  Failed to have a large and prominent "black box" type warning that its cow's milk-based products are known to significantly increase the risk of NEC and death when compared to Human Milk in premature infants; and/or

      h.  Failed to provide well researched and well-established studies that linked its cow's milkbased product to NEC and death in premature infants;

      i.  Failed to cite to or utilize current up-to-date medical data on the proper and safe use of its product; and/or

      j.  Failed to otherwise warn physicians and healthcare providers of the extreme risk associated with feeding premature infants cow's milk-based formula; and/or

      k.  Had physicians and healthcare providers known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would have

not used such a dangerous product; and/or

l. Failed to send out "Dear Dr." letters warning of the risks of NEC and death and the current scientific research and data to better guide the the hospitals and physicians to better care for the extremely premature infants; and/or

m. Failed to advise physicians and healthcare providers that cow's milk-based products are not necessary to achieve growth and nutritional targets for premature infants; and/or

n. Failed to advise physicians and healthcare providers that human milk is superior to cow's milk-based products with regard to the overall health of a premature infant; and/or

o. Failed to instruct or warn that an exclusive human milk based diet significantly decreases the risk of NEC when compared to a cow's milk diet; and/or

p. Failed to advise physicians and healthcare providers that Prolacta is a better alternative to cow's milk-based fortification; and/or

q. Despite knowing that parents were not being warned of the risk of NEC by their physician, failing to take adequate measures to warn the parents directly; and/or

Defendant's massive marketing campaign as detailed in previous paragraphs has had the effect of: (1) diminishing the ability of parents to intelligently resist the decision of a healthcare provider to give formula; (2) diminished mom's desire and sense of import to breastfeed; (3) diminished the relationship between physician and patient relative nutritional decision-making; (4) made it more difficult for a physician to persuade a mother to breastfeed; (5) made it easier and more economically viable for hospitals to feed preemies formula over donor milk or human milk-derived fortifiers; and/or

r. Failed to instruct physicians not to feed infants under 1,000 grams; and/or

s. Failed to instruct physicians on when or how to transition to 100% cow's milk-based formula; and/or

t. Failed to require or recommend hospitals and/or physicians inform parents that their product significantly increases the risk of NEC and death before allowing the product to be fed to their premature infants; and/or

u. Failed to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

a. Failed to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

b. Failed to provide detailed and adequate instructions on proper use, administration, application, and limitations of its products specifically designed for premature infants; and/or

v. Failed to provide periodic or yearly safety reports; and/or

w. Failed to provide periodic or yearly risk-benefit analysis for use of its product; and/or

    x.  Failed to provide or produce yearly safety update reports; and/or

    y.  Failed to develop comprehensive mitigation strategies to reduce the risk of N.E.C. and death in its products specifically designed for premature infants; and/or

    z.  Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

  aa.  Failed to provide statistical evidence of adverse effects regarding the feeding of its product; and/or

  bb.  Failed to guide or instruct on when to start, how much to start, how to increase, volume and timing of feeds, when not to feed, and/or when to stop feeding its product to premature infants; and/or

  cc.  Failed to guide or instruct on how to properly monitor a preterm infant who is fed the product; and/or

  dd.  Failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of NEC and death to the parents and/or

  ee.  As a result of the inadequacy of the warnings and the pervasive marketing suggesting the safety and necessity of their products, Baby Aries was fed cow' s milk-based products which caused him to develop NEC and ultimately die.

  ff.  As a result of the failures to warn as aforementioned, Baby Aries developed NEC and died.

B.  Strictly Liable for Defective Product

    a.  Unlike drugs and medical devices, *Neosure* did not at all relevant times require FDA "approval" prior to entering market;

    b.  Unlike drugs and medical devices, *Similac Human Milk Fortifier* did not at all relevant times require FDA "approval" prior to entering the market;

    c.  Unlike drugs and medical devices, *Similac Special Care* did not at all relevant times require FDA "approval" prior to entering the market;

    d.  Unlike drugs and medical devices, *Neosure* did not at all relevant times require FDA "approval" before making a "change" to the design or formulation of the product;

    e.  Unlike drugs and medical devices, *Similac Human Milk Fortifier* did not at all relevant times require FDA "approval" before making a "change" to the design or formulation of the product;

    f.  Unlike drugs and medical devices, *Similac Special Care* did not at all relevant times require FDA "approval" before making a "change" to the design or formulation of the product;

    g.  Replacing cows' milk with human milk in *Neosure, Similac Human Milk For-*

*tifier and Similac Special Care* would not result in adverse impact on levels
of nutrients or availability of nutrients.  Therefore, the products did not re-
quire FDA notification prior to making any changes;

h.  Even if FDA notification were required, which plaintiff maintains it was not,
nothing in the Infant Formula Act would prevent Defendant from making the
substitution as required by the Connecticut Product Liability Act;

i.  Defendant's defective design revolves around its insistence on using cow-
milk for its products.  Human milk could have feasibly, although less profita-
bly, substituted the cow milk.  Such a change would not have resulted in an
"adverse impact on levels of nutrients or availability of nutrients" pursuant to
21 C.F.R. § 197.50(b)(4).  Consequently, no FDA submission, notification, or
approval was required under Federal law prior to changing the product;

j.  Defendants products were defectively designed as aforementioned;

k.  Defendants products were unreasonably dangerous as aforementioned;

l.  Over the last several years, scientific data and well researched studies have
concluded that the cow's milk-based products of the defendant carried unrea-
sonable risks of NEC and death, which far outweighed the products' benefits;

m.  The product risk of causing Necrotizing Enterocolitis was extreme, and sub-
stantially deviated from consumer expectation;

n.  Failed to develop a human-based milk product which was safer for extremely
premature infants;

o.  As a result of the defective design of the product, Baby Aries developed NEC
and died;

p.  The defective design was the proximate cause of Baby Aries suffering NEC,
and the proximate cause of his death; and

q.  Failed to properly reformulate its product to reduce the risks of NEC and
death

Pre-FDA Submission - Strict Liability

r.  For Decades, Defendant knew or should have known that infant formula and
fortifier containing bovine milk was extremely dangerous to prematurely born
infants in that it placed them at increased risk of getting Necrotizing
Enterocolitis;

s.  Defendants products were unreasonably dangerous as aforementioned *before*
they were ever submitted to the FDA and *prior* to entering the market;

t.  Specifically *Neosure* was defective *prior* to entering the market, and/or de-
fendant knew or should have known it was defective *prior* to entering the
market.

u.  Specifically, *Similac Human Milk Fortifier* was defective prior to enter the
market and prior to being submitted to the FDA, and/or defendant knew or

should have known it was defective prior to entering the market.

    v.  Specifically, *Similac Special Care* was defective prior to enter the market, and prior to being submitted to the FDA, and/or defendant knew or should have known it was defective prior to entering the market.

Causation and Damages.

    w.  The defective product was the proximate cause (a substantial factor) of Baby Aries' necrotizing enterocolitis, pre-death pain and suffering, and death.

## C.  Negligence

Despite knowing that its products significantly increased the risk of NEC in premature infants, the defendant was careless and negligent and failed to act as a reasonably prudent manufacturer of premature infant formula in one or more of the following ways:

    a.  Failing to collect data to determine if its products were safe for premature infants; and/or

    b.  Failing to collect data to determine when and how its products could be used safely; and/or

    c.  Failing to utilize the significant peer reviewed research to develop instructions and/or warnings on how and when its products should be used in order to protect babies from NEC and death; and/or

    d.  Continuing to utilize outdated and ineffective instructions and warnings knowing they were inadequate based in modern science; and/or

    e.  Failing to continuously and vigorously study its cow's milk-based products in order to avoid NEC and death in premature infants; and/or

    f.  Failing to develop evidence-based guidelines or instructions to decrease the risk of its products causing NEC and death; and/or

    g.  Failing to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

    h.  Failing to establish a standard for safe use; and/or

    i.  Failing to stop or deter its products from being fed to extremely premature infants like Baby Aries; and/or

    j.  Failing to provide evidence based instructions or guidance on when or how an extremely premature infant should be transitioned to the defendant's product; and/or

    k.  Failing to properly and thoroughly identify the hazards associated with its products to minimize its risks to premature infants

    l.  Failing to guide or instruct on how to properly monitor a preterm infant who is fed he product; and/or

46

m.  Failing to guide or instruct on when to start, how much to start, how to in-
    crease, volume and timing of feeds, when not to feed, and/or when to stop
    feeding its product to premature infants; and/or

n.  Failing to provide detailed and adequate instructions on proper use, admin-
    istration, application, and limitations of its products specifically designed for
    premature infants; and/or

o.  Failing to take reasonable steps to protect premature infants from developing
    N.E.C. and death when feeding their products; and/or

p.  Failing to properly work with physicians and hospitals on developing ways to
    reduce N.E.C. and death when its products were fed to premature infants;
    and/or

q.  Failing to send out letters with warnings to hospitals, NICUs and doctors that
    its products were significantly increasing the risk of NEC and death in prema-
    ture infants; and/or

r.  Improperly promoting and marketing its Similac brand for premature infants
    to physicians as safe and necessary for growth when in fact, its product was
    extremely dangerous; and/or

s.  Negligently promoting the notion that Defendants products were necessary to
    promote "catchup growth"; and/or

t.  Failingto instruct or warn that an exclusive human milk based diet significant-
    ly decreases the risk of N.E.C. when compared to a cow's milk diet; and/or

u.  Failing to send out letters with instructions to hospitals, NICUs and doctors
    on when and how its products should be used to avoid NEC and death; and/or

v.  Failing to market and/or sell its products in a way which would protect the
    premature infants from NEC and death; and/or

w.  Failing to provide proper training or information to health care providers for
    safe use of its products; and/or

x.  Failing to take reasonable precautions to prevent premature infants from de-
    veloping NEC or dying; and/or

y.  Failing to develop or reformulate its product to make it safer for premature in-
    fants; and/or

z.  Failing to develop a human milk based premature infant formula/fortifier;
    and/or

aa. Failing to properly or promptly notify the FDA that its cow's milk-based
    product was significantly increasing NEC and death in premature infants;
    and/or

bb. Failing to notify the FDA and medical providers that Defendants products
    were not necessary for "catch-up growth"; and/or

cc. Despite knowing that NICU's and physicians were not warning of the risk of
    NEC, failing to require or recommend that hospital warn of such; and/or

dd. Despite knowing for many years that the most vulnerable humans were suf-

fering extreme harm related to the feeding of its products, failing to properly perform a type of pharmacovigilance for the scientific process of collection, detection, assessment, monitoring, and prevention of adverse effects for its premature baby formula and fortifiers; and/or

ee. Failing to exercise proper pharmacovigilance for a product which was significantly more dangerous than most prescription drugs; and/or

ff. Improperly creating agreements with hospitals whereby its products would be over utilized to the detriment of the premature infants; and/or

gg. Improperly promoting continued use of its product in hospitals despite knowing of the great harm it was causing; and/or

hh. Improperly providing free and/or reduced price Similac products to hospitals which has caused significant harm to premature infants across the United States; and/or

ii. Failing to properly work with the FDA on developing ways to reduce NEC and death when it's products were fed to premature infants; and/or

jj. Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

kk. Failing to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

ll. Failing to provide statistical evidence of adverse effects regarding the feeding of its product; and/or

mm.   Failing to provide periodic or yearly safety reports; and/or

nn. Failing to provide periodic or yearly risk-benefit analysis for use of its product; and/or

oo. Failing to provide or produce yearly safety update reports; and/or

pp. Failing to develop comprehensive mitigation strategies to reduce the risk of NEC and death in its products specifically designed for premature infants; and/or

qq. Intentionally promoting a culture of silence whereby the harmful effects of its products were never being communicated to the parents or the public; and/or

rr. Despite knowing that Hospitals and NICU's were failing to provide adequate warnings to parents, Defendant failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of NEC and death to the parents; and/or

ss. The above stated negligence was the proximate cause (substantial factor) of Baby Aries getting NEC, and the proximate cause of his death.

D.  Negligent Misrepresentation

a.  This "theory" of liability is presented under the Connecticut Product Liability Act.  The Connecticut Product Liability Act, C.G.S. Sec. 52-572m(b), specif-

ically defines a "product liability claim" to include theories of  "misrepresen-
tation or nondisclosure, whether negligent or innocent." as amongst those
theories properly subsumed by the Product Liability Act.  Accordingly, "Neg-
ligent Misrepresentation" is included as a "theory" of liability within the
CPLA count.

b.  The allegations contained in previous paragraphs set forth *specific* representa-
tions Abbott has made to consumers, physicians and medical staff through its
advertising and promotional materials (some of which are actually inserted
above).  The allegations contained in those paragraphs are incorporated here-
in.  Upon information and belief said representations were made by Abbott on
an ongoing and repeated basis, and specifically relevant here, at various
points prior to the baby being fed Abbott products.

c.  The defendant misrepresented that its cow's milk-based products were safe
and beneficial for premature infants when it knew or should have known that
its products were unreasonably dangerous and caused NEC and death in
premature infants.

d.  The defendant misrepresented to parents, physicians and healthcare providers
that its cow's milk-based products were necessary to the growth and nutrition
of premature infants, when it knew or should have known that its products
were not necessary to achieve adequate growth.

e.  Defendant misrepresented that its Products have no serious side effects, when
it knew or should have known the contrary to be true.

f.  Defendant negligently misrepresented that cow's milk-based products are safe
for premature infants;

g.  Defendant negligently misrepresented that cow's milk-based products are
necessary for optimum growth; and

h.  Defendant negligently misrepresented that cow's milk-based products are
similar or equivalent to human milk.

i.  Defendant negligently used the brand "Human Milk Fortifier", which sug-
gests to average consumers that the product is derived from human milk.

j.  The aforementioned misrepresentations were the proximate cause of Baby
Aries getting NEC, and the proximate cause of his death.

k.  Defendant, at all relevant times should have known, based on existing studies,
that marketing of formula negatively impacts a mother's decision to lactate
and produce her own milk.

l.  Despite ample evidence whereby defendant should have known that cow milk
based formula is not a suitable alternative to breastmilk, Defendant has mar-
keted its product as a suitable alternative.

m.  Despite ample evidence whereby Defendant should have known that cow
milk based formula significantly increases the risk of a premature infant de-
veloping Necrotizing Enterocolitis, Defendant has marketed the product as

safe for premature infants.

n.  Despite ample evidence whereby Defendant should have known that cow milk based products are not necessary to the adequate growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

o.  Despite ample evidence whereby Defendant should have known that cow milk based products are not necessary to the adequate growth of a premature infant, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

p.  Despite ample evidence whereby Defendant should have known that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

q.  Despite ample evidence whereby Defendant should have known that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

r.  Baby Aries' mother was exposed to some of the marketing described in "the marketing" section above portraying cow milk-based products as a reasonable alternative to breastmilk.

s.  Baby Aries' mother was exposed to some of the marketing described in "the marketing" section above portraying cow milk-based products as necessary for premature infants for "catch-up growth".

t.  Baby Aries mother was enticed into joining *Similac Strong Moms Rewards*, which entices mothers with coupons, other gifts, and what Abbott claims is "nutrition guidance for you and your baby".  Once a mother joins this group, Abbott gains access and knowledge about the member, all which Abbott uses to more effectively and in targeted fashion persuade the user towards its products and misinform the user of the purported benefits of the product.

u.  Anika Hunte was enticed by the coupons, the gifts and the belief she would receive valuable educational material as a result of her membership in *Similac Strong Moms*.  As a result of this membership, Abbott gained access to substantial private information that helped Abbott target its marketing efforts at Anika Hunte.  For example, Abbott was aware that Anika Hunte was pregnant and that she was in her 27th week, getting ready to enter her third trimester.

v.  On January 18, 2018, Anika Hunte, was hospitalized, expecting the premature birth of Baby Aries.  At this time, she was aware that she was imminently to deliver and extremely premature baby.  She was mentally and physically exhausted, and was particularly susceptible to influence, disinformation and deception.  On said date, while hospitalized, Anika Hunte received an email

from Abbott (Similac StrongMoms).  The email is designed to build a rela-
tionship with the expectant mother and instill trust in Similac products.  The
email contains various links which are designed to message the quality of
Abbott's brands and control the message regarding the nutritional needs of
babies.

w. As a result of the marketing and representations described above, Baby Aries'
mother was caused to believe that formula was a suitable alternative to breast
milk.

x. As a result of the marketing and representations described above, Baby Aries'
mother was caused to believe that formula was safe for premature infants.

y. As a result the marketing and representations described above, Baby Aries'
mother was caused to believe that formula was necessary for the growth of
the premature infants.

z. As a result of the marketing and representations described above, Baby Aries'
mother was rendered less motivated and less determined to resist the decision
of her physicians to feed her baby cow based products.

aa. As a result of the marketing and representations described above, Baby Aries'
mother was rendered less capable of engaging in informed consent regarding
the care and nutrition of her child.

bb. As a result of the marketing and representations described above, Baby Aries
mother was rendered a less effective advocate for the medical decisions being
made for her child.

E.  Breach of Express Warranties

a. The allegations contained in previous paragraphs set forth specific representa-
tions Abbott has made to consumers, physicians and medical staff through its
advertising and promotional materials (some of which are actually inserted
above).  The allegations contained in those paragraphs are incorporated here-
in.  Upon information and belief said representations were made by Abbott on
an ongoing and repeated basis, and specifically relevant here, at various
points prior to bovine products being fed.

b. Defendant expressly warranted, through direct- to-consumer marketing, ad-
vertisements, and labels, that the Products were safe and effective for reason-
ably anticipated uses, including use by premature infants.

c. Defendant expressly warranted that its product was similar or equivalent to
human milk.

d. Defendant expressly warranted that its products were necessary for "catch-up
growth" of premature infants.

e. The Product did not conform to these express representations because they
cause serious injury when used to feed premature infants and because the

       products were not necessary for catch-up growth.

    f.   The aforementioned breached warranties were the proximate cause of Baby Aries getting NEC, and the proximate cause of his death.

## F.   Punitive Damages

    a.   Pursuant to Conn. Gen. Stat. Section 52-240b plaintiff seeks punitive damages in that the defendant was reckless in that it continued to market and sell its cow's milk-based products to premature infants when it knew its product was causing death and NEC in these babies; and/or

    b.   Intentionally ignored or avoided the more recent scientific data and studies concluding that its product was causing NEC and death so that it could continue to profit from the sale of its product; and/or

    c.   Intentionally failed to take protective measures it knew would save premature infants from developing NEC and/or dying; and/or

    d.   Intentionally allowed NICUs, hospitals, and doctors to utilize different feeding strategies instead of developing an evidence based nationwide safety plan to prevent its product from causing NEC and death in premature infants; and/or

    e.   Continued to claim its product was beneficial to the growth of extremely premature infants when it knew its cow's milk-based product was unnecessarily causing NEC and death in these babies; and/or

    f.   Deliberately withheld important data to the FDA that its product was causing NEC and death in premature infants; and/or

    g.   Failed to promote human based milk and instead continued to promote its dangerous cow's milk-based product for premature infants because it did not have a human based product it could sell.
Designed an intentional and reckless marketing campaign designed to deceive parents and healthcare providers regarding the safety and necessity of their products.

## COUNT TWO- INTENTIONAL MISREPRESENTATION

1-152.   Plaintiff incorporates by reference paragraphs 1-152 of the preceding paragraphs as if fully set forth herein.

153.    The allegations contained in previous paragraphs set forth specific representa-

tions Abbott has made to consumers, physicians and medical staff through its advertising and promotional materials (some of which are actually inserted above). The allegations contained in those paragraphs are incorporated herein. Upon information and belief said representations were made by Abbott on an ongoing and repeated basis, and specifically relevant here, at various points between January 1, 2018 and February 22, 2018.

154.    The defendant knew that its representations claiming its products were safe were false.

155.    The defendant knew that its product placed premature infants at significant risk of developing necrotizing enterocolitis, yet nevertheless marketed its product as safe and effective for premature infants.

156.    Defendant intentionally misrepresented that cow's milk-based products are necessary for optimum growth.

157.    Defendant intentionally misrepresented that cow's milk-based products are similar or equivalent to human milk.

158.    Defendant at all relevant times knew, based on existing studies, that marketing of formula negatively impacts a mother's decision to lactate and produce her own milk.

159.    Despite knowing that cow milk based formula is not a suitable alternative to breastmilk, Defendant has marketed its product as a suitable alternative.

160.    Despite knowing that cow's milk based products are not necessary to the adequate growth of a premature infant, Defendant has marketed its product to moms and dads as

necessary for "catch-up growth" for premature infants.

161.    Despite knowing that cow's milk based products are not necessary to the adequate growth of a premature infants, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

162.    Despite knowing that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

163.    Despite knowing that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

164.    Baby Aries' mother was exposed to some of the marketing described in "the marketing" section above portraying cow's milk-based products as a reasonable alternative to breastmilk.

165.    Baby Aries' mother was exposed to some of the marketing described in "the marketing" section above portraying cow's milk-based products as necessary for premature infants for "catch-up growth".

166.    Baby Aries mother was enticed into joining *Similac Strong Moms Rewards*, which entices mothers with coupons, other gifts, and what Abbott claims is "nutrition guidance for you and your baby".  Once a mother joins this group, Abbott gains access and knowledge about the member, all which Abbott uses to more effectively and in targeted fashion persuade

the user towards its products and misinform the user of the purported benefits of the product.

167.    Anika Hunte was enticed by the coupons, the gifts and the belief she would re-ceive valuable educational material as a result of her membership in *Similac Strong Moms.*  As a result of this membership, Abbott gained access to substantial private information that helped Abbott target its marketing efforts at Anika Hunte.  For example, Abbott was aware that Anika Hunte was pregnant and that she was in her 27th week, getting ready to enter her third trimester.

168.    On January 18, 2018, Anika Hunte, was hospitalized, expecting the premature birth of Baby Aries.  At this time, she was aware that she was imminently to deliver an extreme-ly premature baby.  She was mentally and physically exhausted, and was particularly susceptible to influence, disinformation and deception.  On said date, while hospitalized, Anika Hunte re-ceived an email from Abbott (Similac StrongMoms).  The email was designed to build a rela-tionship with the expectant mother and instill trust in Similac products.  The email contains vari-ous links which are designed to message the quality of Abbott's brands and control the message regarding the nutritional needs of babies.

169.    As a result of the marketing described above, Baby Aries' mother was caused to believe that formula was a suitable alternative to breast milk.  This belief was a substantial factor in the baby consuming this dangerous product, which, in turn, was a substantial factor in the ba-by developing Necrotizing Enterocolitis and death.

170.    As a result of the marketing described above, Baby Aries' mother was caused to believe that formula was safe for premature infants.  This belief was a substantial factor in the baby consuming this dangerous product which, in turn was a substantial factor in the baby de-

veloping Necrotizing Enterocolitis and death.

171.    As a result of the marketing described above, Baby Aries' mother was caused to believe that formula was necessary for the growth of the premature infants.  This belief was a substantial factor in the baby consuming this dangerous product which, in turn was a substantial factor in the baby developing Necrotizing Enterocolitis and death.

172.    As a result of the marketing described above, Baby Aries' mother was rendered misinformed, and/or less motivated and/or less determined to insist that her baby be provided exclusively human milk.  This belief was a substantial factor in the baby consuming this danger-ous product which, in turn was a substantial factor in the baby developing Necrotizing Enterocolitis and death.

173.    As a result of the marketing described above, Baby Aries' mother was rendered misinformed and/or less motivated and/or less determined and was rendered less capable to re-sist the decision of her physicians to feed her baby cow's milk-based products.

174.    As a result of the marketing described above, Baby Aries' mother was rendered less capable of providing informed consent regarding the care and nutrition of her child.

175.    As a result of the marketing described above, Baby Aries' mother was rendered a less effective advocate for the medical decisions being made for her child.

176.    Defendant's marketing campaign was designed to increase profit.  Formula is in direct competition with mother's milk.  Causing mothers to decrease lactation consequently causes increased market share and greater revenues.

177.    Causing mothers to believe that bovine products are suitable alternatives to breast milk causes a greater likelihood that a mother will purchases bovine products.

178.    Causing mothers to believe that bovine products are safe will increase the likelihood that a mother will purchase bovine products.

179.    Defendant's marketing campaign targeting new babies was willful, in that defendant knows that once a baby begins a formula diet, a mother rarely returns to lactation.

180.    Defendant's marketing campaign targeting new babies was willful, in that defendant knows that once a baby is fed a particular brand, there is strong brand loyalty which will result in extended revenues over the course of years.

181.    Defendant's marketing was willful and with reckless disregard and was motivated by a desire to not lose market share to lactation.

182.    Defendant's improper marketing was in direct violation of the Code, and recklessly ignored the known consequences of direct to consumer marketing, specifically that direct to consumer marketing has the known effect of lowering lactation and exclusive human milk nutrition.

183.    Defendant has developed a product line that is intended to "hook" children at the start of their life with the intent to maintain brand loyalty through nursing and into the toddler years.

184.    Defendant has chosen profit over safety.

185.    Defendant purports to encourage lactation but its marketing uses subtle and devi-

ous techniques to accomplish the opposite.

## COUNT THREE – VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT

1.    This Count is not based on any claim that the Defendant's product was defective or unreasonably dangerous.

2.    Defendants engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

    a.  By developing a systematic, pervasive, deceptive, fraudulent and manipulative marketing scheme designed to make moms believe the formula and other cow's milk-based products were equal to or superior to human milk;

    b.  By developing a scheme to persuade and incentivize physicians and hospitals to use cow milk products;

    c.  By developing a scheme to persuade physicians that cow's-milk based products are necessary;

    d.  By aggressively lobbying government officials to not adopt the Code;

    e.  By engaging in direct-to-consumer marketing, despite knowing that the likely effect of this marketing would result in a decrease in lactation;

    f.  By developing a marketing scheme designed to create a perception that any effort by medical staff to encourage breastfeeding is a form of inappropriate and negative judgment;

    g.  By purporting to support the Code while actually undermining and disobeying

its key provisions;

h.   Through advertising, promotion and marketing, inducing mothers of prema-

ture infants to not breastfeed by diminishing the public perception of the im-

portance of breastfeeding, and placing formula feeding on an equivalent level

- i.e. marketing "personal choice" at the expense of sound medical choice;

i.   While outwardly purporting to support breastfeeding, devised a marketing

campaign which was actually designed to diminish breastfeeding;

j.   Engaging in an industry-wide scheme to defraud consumers and physicians

into believing that there is a bona fide scientific dispute regarding whether

bovine products are necessary to achieve necessary growth and nutrition in

premature infants;

k.   Expending enormous amounts of money on political lobbying, political in-

volvement, "donations" to hospitals, and medical associations, all designed to

protect their financial interests: ensuring that the Government does not suffi-

ciently promote advantages of breastmilk versus formula;  that direct advertis-

ing of infant formula is not prohibited in the United States; and preventing

aggressive federal regulation of formula.  These expenditures were made

from a profit motive, and in direct conflict with the interests of society, and

babies in particular;

l.   Intentionally marketed breastfeeding moms as having unappealing character-

istics, in order to cause mothers to not breastfeed;

m.  Paid "mommy bloggers" to give positive reviews of their product, when they knew this would have the effect of causing moms to believe the reviews were genuine, and thus inducing moms to buy their products;

n.  Supported and financed medical research designed to create doubt in the possibility of an exclusive human milk diet in premature infants;

o.  Through money contributions, endeared itself to the medical profession in order to win favor over the medical profession;

p.  Through its marketing campaigns, created an environment where moms would resist any advice from medical professionals to breastfeed.

3.  Defendant intended for parents and medical staff to rely on its representations, manipulations, and advertisements regarding the Products in order to achieve monetary gain from sale of their Products.  Abbott has spent millions and millions of dollars in promotion, advertising, lobbying, gifts, and "charitable donations" all designed to maintain an image that its product is effective and necessary and all for the purpose of securing profits in an incredibly lucrative industry.

4.  Despite publicly expressing a commitment to breastfeeding, Defendant designed and executed promotional campaigns which discourage or reduce breastfeeding, thus allowing Abbott to capture greater market share and deliver greater profits to their stockholders.

5.  As a result of the unfair trade practices engaged in by the Defendant Abbott, Baby Aries was injured and killed by the cumulative nature of Defendant's conduct. The cumulative effect of Defendant's conduct directed at parents and other consumers was to create demand

for and sell the Products. Each aspect of Defendant's conduct combined to artificially create sales of the product, to deceive the public at large, the medical community and Baby Aries' parents in particular.

6.     Had Defendant not engaged in the intentional, deceptive, unconscionable, immoral, and fraudulent conduct described above, Baby Aries would not have been fed the product, and would not have incurred related injuries and damages.  Specifically, were it not for the intentional, deceptive, unconscionable, immoral, and fraudulent conduct described above: (1) physicians would not likely have provided the products that harmed and killed baby Aries; (2) mothers, and Anika Hunte in particular would not have permitted that Baby Aries be fed the products that harmed and killed Baby Aries; and (3) Anika Hunte would have been more vigilant of what was being fed to her baby, and she would have prevented the products from being fed to her baby, and therefore would have prevented the injury and death to her child.

7.     Defendant's intentional, deceptive, unconscionable, immoral, and fraudulent representations and material omissions to Baby Aries' parents, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Connecticut Unfair Trade Practices Act.

8.     Defendant's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, immoral, unscrupulous, deceptive or fraudulent acts, or trade practices in violation of the Connecticut Unfair Trade Practices Act.

9.     Defendant has engaged in unfair competition or unfair or deceptive acts or trade practices, or has made false representations in violation of the Connecticut Unfair Trade Practic-

es Act.

10.    Baby Aries' physicians and medical staff relied upon Defendants' misrepresentations and omissions in determining which product to use.

11.    Baby Aries' parents were deceived into not objecting to Defendant's products by virtue of Defendant's misrepresentations and omissions and deceptive marketing campaigns.

12.    Abbott's deliberate misrepresentations and omissions about the equivalence and/or superiority of its cow's milk-based product use was further intended to affect the decisions of consumers (parents) to buy Similac products and thereby affect the price of those products. As a result of the defendant's deliberate misrepresentations and omissions as stated above, Abbott unfairly and deceptively maintained the high-price of its Similac product at an inflated level not otherwise attainable and caused the consuming public to pay more for the Similac products that they purchased than was warranted or than they would have otherwise paid in the absence of these deliberate misrepresentations and omissions.

13.    Abbott's pervasive marketing of its Similac products with deliberate misrepresentations and omissions about the equivalence and/or superiority of its cow's milk-based products was intended to affect the decisions of consumers to purchase Similac products. As a result of the defendant's deliberate misrepresentations and omissions stated above, Abbott unfairly and deceptively maintained the high price of its Similac products at inflated levels not otherwise obtainable and caused the consuming public to pay more for Similac than they would have otherwise paid in the absence of these deliberate misrepresentations and omissions.

14.    Abbott's wrongful scheme to promote and market its products has created signif-

icant financial loss to the consumers and improperly discouraged the use of mother's milk or donor milk.

15.     As a further result, the wrongful scheme of over-promoting Similac products in the NICU for free or at a reduced cost with deliberate misrepresentations and omissions about its the equivalence and/or superiority of its cow's milk-based products, in order for the parents to ultimately purchase the products when their child leaves the NICU, has created extensive medical bills and financial loss to the parents and/or to the State of Connecticut, because the products were a substantial factor in the premature infant developing necrotizing enterocolitis, undergoing surgeries, and increased hospitalization costs.

16.     By reason of the unlawful acts engaged in by the Defendant, and as a direct and proximate result thereof, Baby Aries and his estate, suffered ascertainable losses and damages in the form of: (a) lost wages; (b) funeral and burial expenses; (d) medical bills and costs.

17.     By reason of the unlawful acts engaged in by the Defendant, and as a direct and proximate result thereof, Baby Aries and his estate, suffered ascertainable losses and damages because the available breast milk, which was free to Baby Aries' mother, was replaced in part by expensive cow's milk products manufactured and sold by the Defendant.

18.     Additionally, Baby Aries suffered Noneconomic losses including physical and mental pain and suffering, emotional distress, while living; and Death.

19.     Plaintiff is entitled to punitive damages pursuant to Conn. Gen. Stat. §42-110g(a) because defendant's conduct was reckless as set forth in the preceding paragraphs.

## COUNT FOUR- LOSS OF FILIAL CONSORTIUM - ANIKA HUNTE

1.      Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

2.      Loss of filial consortium is a derivative claim.  It is derivative of each of the claims and allegations above.

3.      At all relevant times Anika Hunte was the lawful mother of Baby Aries.

4.      As a result of the tortious conduct of the defendant, Abbott Laboratories, Inc., the plaintiff, Anika Hunte, suffered a loss of affection, companionship, society and consortium of her son Aries Peterson.

## COUNT FIVE- LOSS OF FILIAL CONSORTIUM - DANE PATERSON

1.      Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

2.      Loss of filial consortium is a derivative claim.  It is derivative of each of the claims and allegations above.

3.      At all relevant times Dane Peterson was the lawful father of Baby Aries.

4.      As a result of the tortious conduct of the defendant, Abbott Laboratories, Inc., the plaintiff, Dane Peterson, suffered a loss of affection, companionship, society and consortium of his son Aries Peterson.

WHEREFORE, Plaintiff demands:

a)       Fair, just and adequate money damages;
b)      As to the reckless allegations, punitive damages up to twice the damages pursuant

to 52- 240b;

c)       Attorneys fees;

d)       Punitive Damages pursuant to Conn. Gen. Stat. §42-110g(a);

e)       Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues and causes of action.


Dated:  February 26, 2021


By: _____

Jose Rojas, Esq.

Levin, Rojas, Camassar & Reck, LLC

40 Russ Street

Hartford, CT  06106

(860) 860-232-3476

# Exhibit A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ANIKA HUNTE, AS ADMINISTRATOR
OF THE ESTATE OF ARIES PETERSON,
ANIKA HUNTE, INDIVIDUALLY, AND
DANE PETERSON, INDIVIDUALLY

Civil Action No.: No. 3:20-cv-1626 (SRU)

             Plaintiff,

Vs.


ABBOTT LABORATORIES, INC.

             Defendants.

**AMENDED COMPLAINT**


**INTRODUCTION**

1.      This action arises out of the death of a ~~three~~ three-month ~~month~~-old baby, who spent the majority of those three months fighting a horrific and deadly disease caused by cow's milk-based infant formula and/or fortifier.  Necroti~~zs~~ing Enterocolitis ("NEC"), is a deadly disease that largely affects low birth weight babies who are fed cow's milk-based formula or products.  Aries Peterson, a prematurely born, low birth weight baby, was fed *Similac Neosure*, *Similac Human Milk Fortifier* and *Similac Special Care*, and developed NEC shortly thereafter.  Plaintiff Anika Hunte brings this cause of action against Defendant~~s~~ for claims arising from the direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the product known as *Similac Neosure*, *Similac*

1

*Human Milk Fortifier* and *Similac Special Care* (hereinafter collectively referred to as "Products").

**THE PARTIES**

2.      Aries Peterson (the baby) ("Baby Aries") was born at Yale New Haven Hospital in New Haven, Connecticut on January 30, 2018.  He died on April 18, 2018 at Yale New Haven Hospital after developing ~~Necrotising~~Necrotizing Enterocolitis.  Baby Aries developed NEC within days of being fed *Similac Human Fortifier*, a cow's milk-based product, and within a day of being started on *Similac Special Care*.

3.      Anika Hunte is the mother of Baby Aries.  Mrs. Hunte was duly appointed administrator of the Estate of Aries Hunte on September 10, 2020.  She brings this action as Administrator of the Estate of Aries Peterson.  Anika Hunte and Dane Peterson also bring this action in their individual capacity seeking damages for loss of filial consortium.

4.      The defendant, Abbott Laboratories, Inc. manufactures, designs, formulates, prepares, tests, provides instructions, markets, labels, packages, places into the stream of commerce in all fifty states, including Connecticut, and sells premature infant formula including *Similac Neosure, Similac Human Milk Fortifier, and Similac Special Care*, and is a "product seller" in accordance with the Connecticut Products Liability Act (CPLA), Conn. Gen. Stat. Section 52-572m, et seq.

**JURISDICTION**

5.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d) because complete diversity exists between Plaintiff and Defendant, and the matter in controversy, exclu-

sive of interest and costs, exceeds the sum or value of $75,000.

6.     This Court has personal jurisdiction over Defendant because Defendant is author-ized to conduct and does conduct business in the State of Connecticut. Defendant has marketed, promoted, distributed, and sold the Products in the S~~s~~tate of Connecticut and Defendant has suf-ficient minimum contacts with this State and/or sufficiently avails itself of the markets in this State through its promotion, sales, distribution and marketing within this State to render the ex-ercise of jurisdiction by this Court permissible.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judi-cial district. ~~Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact sub-stantial business in this District.~~

**BACKGROUND:**  (The Science, The Marketing and The Baby)

### A.     The Science

8.     According to the World Health Organization ("WHO"), babies born prematurely, or "preterm," are defined as being born alive before 37 weeks of pregnancy are completed, like Baby Aries. The WHO estimates that approximately 15 million babies are born preterm every year and that number is rising.

9.     Nutrition for preterm babies, especially those who have a very low birth weight (under 1500 grams) or extremely low birth weight (under 1000 grams), like Baby Aries (born at just 620 grams), is significantly important. Since the United States ranks in the top ten countries in the world with the greatest number of preterm births, the market of infant formula and fortifi-

ers is particularly vibrant.

10.     Originally, the cow's milk-based products were believed to be good for the growth of premature, low birth weight babies; however, science and research have advanced for decades confirming the significant dangers of the Defendant's cow's milk-based products in causing NEC and/or substantially contributing to death in preterm and severely preterm, low-weight infants, along with many other heath complications and long-term risks to babies, yet, the Defendant did nothing to change its product, packaging, guidelines, instructions, and/or warnings. Additionally, advances in science have created alternative formulas and fortifiers that are derived from human milk and non-bovine based products, however, the defendant continues to promote and sell cow's milk-based products.

11.     The brand name, Similac baby formula, was first launched by Abbott in 1951. Similac baby formula specifically designed for very low birth weight infants was first launched in 1978. Similac baby formula specifically designed for preterm babies was first launched in 1980.

12.     Science and research have advanced in recent years confirming strong links between cow's milk-based products and NEC and death in premature infants.

13.     As early asIn 1990, a prospective multicentre study on 926 preterm infants found that necrotisingnecrotizing enterocolitis was 6-10 times more common in exclusively formula-fed babies than in those fed breast milk alone and three times more common than in those who received formula plus breast milk.  Babies born at more than 30 weeks gestation confirmed that

necrotisingnecrotizing enterocolitis was rare in those whose diet included breast milk; it was 20 times more common in those fed formula only.  Lucas A, Cole T. *Breast milk and neonatal ne-crotising enterocolitis.* Lancet 1990; 336: 1519–1523.

14.     In a study published in 2007 it was reported: "The use of an exclusive HUM [Human] diet is associated with significant benefits for extremely premature infants <1259 g BW.  The benefits include decreased NEC rates, mortality, late-onset sepsis, PDA, BPD, ventilator days, and ROP.  Importantly, while evaluating the benefits of using an exclusive HUM-based protocol, it appears that there were no feeding-related adverse outcomes.  This study demonstrates that an exclusive HUM diet provides important benefits beyond NEC." Sisk, PM, et al. Early human milk feeding is associated with a lower risk of necrotizing enterocolitis in very low birth weight infants. (Journal of Perinatology 2007; 27:428-433.)

15.     A study published in 2010 established that when premature babies were fed an exclusive diet of mother's milk, donor milk, and human milk fortifier, these babies were **90% less likely to develop surgical NEC**.  Sullivan, S., et al, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotising Enterocolitis than a DeathDiet of Human Milk and Bovine Milk-Based Products. (Journal of Pediatrics 2010; 156:562-7)*

16.     In 2011, the Surgeon General published a report titled The Surgeon General's Call to Action to Support Breastfeeding, warning that **"For vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis (NEC)."** U.S. Department of Health and Human Services. The Surgeon General's Call to Action to Support

Breastfeeding. Washington, DC: U.S. Department of Health and Human Services, Office of the Surgeon General; 2011, p. 1.  This same report stated that premature infants who are not breast-fed are 138% more likely to develop NEC.  Id., Table 1, P.2.

17.     In 2012 the *American Academy of Pediatrics* issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC asso-ciated with the consumption of cow's milk-based formula.  The Academy stated that "[t]he po-tent benefits of human milk are such that all preterm infants should receive human milk. . . If the mother's own milk is unavailable . . .  pasteurized donor milk should be used." Pediatrics 2012; 129:e827-e841, *Breastfeeding and the Use of Human Milk*.

18.     A study published in 2013 showed that all 104 premature infants participating in the study receiving an exclusive human-milk based diet exceeded targeted growth standards and length and HC gain (weight and head circumference).  The authors concluded that "this study provides data showing that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet."  Hair, A, et al, BMC Research Notes 2013, 6:-459, *Human milk feeding supports adequate growth in infants  and HC gainbirthweight.*  Thus, inadequate growth was proven to be a poor excuse for feeding cow's milk-based formula.

19.     In another study published in 2013 it was reported: "This is the first randomized trial in EP [Extremely Premature] infants of exclusive HM [Human Milk] vs. PF [Preterm Formula].  The significantly shorter duration of TPN and lower rate of surgical NEC

support major changes in the strategy to nourish EP infants in the NICU." Cristofalo, E.A., et al,

Randomized trial of *Exclusive Human Milk versus Preterm formula.* (J Pediatr 2013 Dec;
163(6): 1592-1595.)

20.   In another study published in 2014, it was reported: "Necrotizing enterocolitis
(NEC) is a devastating disease of premature infants and is associated with significant morbidity
and mortality.  While the pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the
administration of breast milk." Good, Misty, et al., *Evidence--Based Feeding Strategies Before
and After the Development of Necrotizing Enterocolitis.* (Expert Rev Clin Immunol.  2014 July;
10 (7): 875-884.)  In that same study it was reported: "Necrotizing enterocolitis (NEC) is the
most frequent and lethal gastrointestinal disorder affecting preterm infants [1,2], and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure
and death.  NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies [1-3].  The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease [3,4]." "A
wide variety of feeding practices exist on how to feed the premature infant in the hopes of preventing necrotizing enterocolitis. There have been several meta-analysis reviewing the timing of
administration and rate of advancement of enteral feedings in the premature infant as reviewed
above, but there is no consensus on the precise feeding strategy to prevent this disease. The ex-

clusive use of human breast milk is recommended for all premature infants and is associated

with a significant decrease in the incidence of NEC [11–13]. By determining the specific ingre-

dients in breast milk that are protective against NEC, it is our hope that this devastating disease

will one day be preventable."

    21.    In yet another study published in 2014 it was reported: "An exclusive human

milk diet, devoid of CM [Cow Milk] -containing products was associated with lower mortality

and morbidity in EP [Extremely Premature] infants without compromising growth and should be

considered as an approach to nutritional care of these infants." Abrams, Steven, et al.  *Greater*

*Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein*

*Products.* (Breastfeeding Medicine.  2014, Nov. 4, 9(6):281-286.)

    22.    A 2016 study supported previous findings that an exclusive human milk diet in

extreme premature infants dramatically decreased the incidence of both medical and surgical

NEC.  This was the first study to compare rates of NEC after a feeding protocol implementation

at multiple institutions with multiple years of follow-up using an exclusive human milk diet, and

as a result was a very large study.  The authors concluded that "the use of an exclusive HUM

[human milk] diet is associated with significant benefits for extremely premature infants" and

"while evaluating the benefits of using an exclusive HUM-based protocol, it appears that there

were no feeding-related adverse outcomes."   Hair, et al, *Breastfeeding Medicine 2016, 11-2,*

*Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human*

*Milk-Based Diet.*

23.     In an article  study published in 2017, it was reported: "In summary, HM  has

been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC.

Two RCTs on preterm infants weighing between 500 and 1250 g at birth compared the effect of

bovine milk-based preterm infant formula to MOM or DHM on the incidence of NEC.  Both

trials found that an exclusive HM diet results in a lower incidence of NEC."

        19.     A Cochrane systematic review that evaluated the effect of DHM or bovine milk-

based formula on health outcomes for preterm infants also determined that formula significantly

increases the risk of NEC (75)." Shulhan, Jocelyn, et al *Current Knowledge of Necrotizing*

*Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products.*

(Adv.  ASN. ADV Nutr. 2017; 8:8—0-91.)

        24.     In another study published in 2017, supported by prior data, it was reported:

"Human milk is the preferred diet for preterm infants as it protects against a multitude of NICU

challenges, specifically necrotizing enterocolitis…Preterm infants are susceptible to NEC due to

the immaturity of their gastrointestinal and immune systems. An exclusive human milk diet

compensates for these immature systems in many ways such as lowering gastric pH, enhancing

intestinal motility, decreasing epithelial permeability, and altering the composition of bacterial

flora. Ideally, preterm infants should be fed human milk and avoid bovine protein. A diet

consisting of human milk-based human milk fortifier is one way to provide the additional

nutritional supplements necessary for adequate growth while receiving the protective benefits of

a human milk diet." Maffei, Diana, Schanler, Richard J, *Human milk is the feeding strategy to*

*prevent necrotizing enterocolitis!* (Semin Perinatol. 2017 Feb;41(1):36-40.)

25. In summary, medical studies have clearly established that: (1) bovine milk based infant formula substantially increases the risk ~~of~~ of ~~a~~ low birth weight / premature infants developing Necrotizing Enterocolitis; and (2) growth and nutritional benchmarks can be reached or exceeded in low birth weight / premature infants who are fed an exclusive human diet (mom's milk donor milk and a human milk derived fortifier such as Prolacta). *Neosure, Similac Human Milk Fortifier* and *Similac Special Care* are all derived from cow milk, and are therefore are avoidably unsafe products.

B. **The Marketing**

26. Notwithstanding strong medical evidence establishing the extreme dangers that cow's milk-based products pose for premature infants, Abbott has marketed its cow's milk-based products as an equally safe alternative to breast milk, and indeed has promoted its products as necessary for additional nutrition and growth. The Defendant has specifically marketed its formula and fortifier as necessary to the growth and development of *premature infants*, when indeed its products pose a known and substantial risk to these babies.

~~21~~27. Defendant Abbott routinely offers~~Abbott has attempted to "hook" moms on formula, by offering~~ free formula and other goodies in baskets given to moms by their OBGYNs before birth and after birth in hospital and medical clinics. The impetus behind such efforts is to create brand loyalty, and create the appearance of "medical blessing" so that moms continue to use formula to feed their babies after they leave the NICU, at great expense to the

parents, and substantial profit to Abbott.

28.     Abbott's practice of trying to get moms to choose formula over breast milk goes back decades.  The company has for decades promoted its product as more healthy, necessary for adequate nutrition, and the choice for the modern, sophisticated mother.  Their advertising has at times attempted to portray breast feeding as an inferior, less sophisticated choice.

29.     The World Health Organization (WHO) and United Nation's International Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address the international marketing of breast-milk substitutes.  The World Health Director concluded the meeting with the following statement: **"In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement."** (Baumslag & Michels, 1995, p. 161).  Recognizing the abuse and dangers of the marketing of Infant formula, in 1981, the World Health Assembly (WHA; the decision-making body of the world's Member States) developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, and outlawed any advertising or promotion of breast milk substitutes to the general public.  The International Code of Marketing of Breast-milk Substitutes specifically prohibited advertising in Article 5 Section 1: "There should be no advertising or other form of promotion to the general public..." The International Code of Marketing of Breast-milk Substitutes. Geneva: World Health Organization, p.16 - 20 (1981).

30.     Abbott has acknowledged the Code: "We support, educate and encourage mothers to breast-feed for as long as possible, including, where possible, exclusive breast-feeding

11

during the first six months of life and continued breast- feeding up to and beyond two years of age. . . We acknowledge the importance of the World Health Organization's 1981 International Code of Marketing of Breast-Milk Substitutes (the "WHO Code") and subsequent World Health Assembly (WHA) resolutions. We respect the aim and principles of the WHO Code to contribute to the provision of safe and adequate nutrition for infants, by: a) the protection and promotion of breast-feeding; and b) ensuring the proper use of Breast-milk Substitutes, when these are necessary, on the basis of adequate information and through appropriate marketing and distribution." *Abbott Policy on the Marketing of Instant Formula.*

31.    Despite this assurance and warranty contained in its Policy, Abbott has systematically violated the Code's most important provision:  "There should be no advertising or other form of promotion to the general public..."

~~26~~32.    Notwithstanding the Code of Marketing of Breastmilk Substitutes, and Abbott's purported commitment to the Code, advertising of infant formula has remained pervasive and widespread in the United States. Defendant Abbott aggressively markets and continues to advertise directly to the new parents by suggesting that by buying these products, they will benefit their newborns and give them the very best chance of survival. The pervasive marketing involved, ostensibly prohibited by the Code, has impacted the perceptions of synthetic non-human milk derived substitutes, such as formula and fortifier, in such a way that it lessens the likelihood that a parent of a baby receiving this food in the NICU will ask questions, query about alternatives, or object to its ingestion. In short, Defendant Abbott has systematically violated the Code's central provision.

33.    Similac was deceptive from its very inception.  Similac's very name (*i.e. similar to lactation*) is deceptive.  Beginning with its brand name, Abbott has continued to perpetuate the deception that its product is on par with or similar to human milk. This marketing has altered the perceptions of parents and directly contradicts the medicine and the science.

34.    One study reports that, "Since the late 19th Century, infant formula manufacturers have encouraged mothers to substitute formula for breastmilk." *Rosenberg KD, Eastham CA, Kasehagen LJ, Sandoval AP. Marketing infant formula through hospitals: the impact of commercial hospital discharge packs on breastfeeding. Am J Public Health. 2008;98(2):290-295.* The same study has also found that manufacturers have repeatedly used their relationships with hospitals and the discharge process to encourage mothers to substitute formula for breast milk even after they leave the hospital.

——

35.    Indeed, most hospitals in the U.S. distribute "commercial discharge bags packaged as smart diaper bags containing various coupons, advertisements, baby products, and infant formula samples." Yeon Bai, et al, *Alternative Hospital Gift Bags and Breastfeeding Exclusivity*, ISRN NUTR., article ID 560810:2(2013). These commercial gift bags send confusing signals to breastfeeding mothers and have been shown to negatively impact breastfeeding rates. Id. at 5. However, the practice continues since it is a very effective way to encourage potential formula customers, including the parents of preterm infants whom are encompassed within the company's overall marketing strategy.

13

36. Similac routinely compares its products with human breast milk and attempts to create an equivalency.  For example, ~~one author found an~~ an advertisement for *Similac Advance published* on the back cover of American Baby Magazine, April 2004 issue ~~which~~ made repeated references and comparisons to breast milk, and indeed the short ad uses the phrases **"like breastmilk" six times.**  *See advertisement on next page.*  See also, Broussard Hyderkhan, A, *Mammary malfunction: a comparison of breastfeeding and bottle feeding product ads with magazine article content*, 2005.  The pervasive exposure by mothers to media, advertising and promotion ;equating human milk to breastmilk has the generalized impact of: (a) reducing lactation; (b) causing mothers to believe formula is comparable to breastmilk; and (c) reduces the capacity for informed consent and informed decision-making.  Through long-term exposure to Abbott's advertising, Baby Aries mother had been conditioned and was caused to believe that Similac products are suitable alternatives to breastmilk and necessary supplements for low birth weight infants.

14



## 𝒮imilac® Advance® can help develop both your baby's immune system and brain like breast milk.

(Kisses, hugs, and silly songs are up to you.)



**Breastfeeding is recommended for its many benefits. If you choose to feed formula, ask your doctor about Similac Advance.**



### Only Similac Advance with DHA and ARA has both*:

- A patented blend of special breast milk nutrients called nucleotides, which has been clinically shown to help support the development of a baby's immune system like breast milk.

  *The clinical study showed immune cell development like breast milk. Whether this development provides immune protection like breast milk has not been shown. Breast milk also contains antibodies not found in infant formulas that are important for a baby's immune protection.*

- Published long-term clinical research showing brain development like breast milk.*

𝒮o much like breast milk in so many ways.

*Among formulas with DHA and ARA; infants studied at 12 and 39 months of age. ©2004 Abbott Laboratories.
www.SimilacAdvance.com

37.     In addition to perpetuating the myth that Similac is *"like breastmilk"*, Abbott has also deceived the public into believing that Physicians believe Similac is an ideal choice for babies.

38.     Beginning in 1989, Abbott began using claims in its advertising that Similac was "first choice of more physicians."

39.     Although the claim did not specifically compare itself to breast milk, a plain interpretation of this claim is that physicians believe Similac is the "1st choice," naturally implying that it is superior even to breastfeeding.

40.     Beginning in 1995, Abbott began a heavy marketing campaign which featured "1st choice of Doctors" on all its infant formula product labels.

41.     A marketing report commissioned by Abbott in March, 1998 summarized con-
sumer reactions to several informational advertising pamphlets on Similac.  The one stressing
the "1st Choice of Doctors" claim scored highest in terms of consumers' likelihood of purchase.
The report concluded: "Doctor recommendations and the `science' behind the formula appeared
to drive purchase interest for this concept, as well as the other concepts tested," and use of simi-
lar pieces emphasizing the claim was "highly recommended."

42.     One study estimates that formula manufacturers spent $4.48 billion on marketing
and promotion in 2014.  *Baker, P, et al, Global trends and patterns of commercial milk-based
formula sales: is an unprecedented infant and young child feeding transition underway?  Public
Health Nutrition, 2016.*

43.     The contradictory messages women receive from images, articles, and advertising
in doctors' offices, hospitals, and popular magazines imply that breastfeeding is unnecessary and
difficult if not impossible to achieve" Hausman, B. L. (2000, Summer). *Rational management:
Medical authority and ideological conflict in Ruth Lawrence's Breastfeeding: A guide for the
medical profession*. Technical Communication Quarterly, 9(3), 271-289.

44.     One study found that direct-to-consumer advertising increased request rates of
brand choices and the likelihood that physicians would prescribe those brands. Parker, R. S., &
Pettijohn, C. E. (2003). *Ethical considerations in the use of direct-to- consumer advertising and
pharmaceutical promotions: The impact on pharmaceutical sales and physicians. Journal of
Business Ethics*, 48, 279-290.

45.     One study found that exposure to infant feeding information through media ad-

vertising has a negative effect on breastfeeding initiation. *Merewood A, Grossman X, Chaudhuri J, Sadacharan R, Fein SB. Exposure to infant feeding information in the media during pregnancy is associated with feeding decisions postpartum. Paper presented at American Public Health Association 138th Annual Meeting & Exposition; November 2010; Washington, DC.*

46.    In a study on infant feeding advertisements in 87 issues of Parents magazine, a popular parenting magazine, from the years 1971 through 1999, content analysis showed that when the frequency of infant formula advertisements increased, the percentage change in breastfeeding rates reported the next year generally tended to decrease. *Stang J, Hoss K, Story M. Health statements made in infant formula advertisements in pregnancy and early parenting magazines: a content analysis. Infant Child Adolesc Nutr. 2010;2(1):16-25.*

47.    The Stang study also found that Infant formula company websites, printed materials, coupons, samples, toll-free infant feeding information lines, and labels may mislead consumers into purchasing a product that appears equivalent or superior to human milk. This may induce reliance on a biased source for infant feeding guidance. *Stang J, Hoss K, Story M. Health statements made in infant formula advertisements in pregnancy and early parenting magazines: a content analysis. Infant Child Adolesc Nutr. 2010;2(1):16-25.*

48.    Abbott has developed an advertisement campaign which attempts to create a perception of "mommy wars." One advertisement, which received significant attention, *The Mother 'Hood* tries to depict a "mom war," where all the competing sides come together to save a baby at the end.  The ad is effective in so much as it is manipulative.  The advertisement, at one

point depicts three "bottle feeding moms,", and one of them proclaims:  "*Oh look, the breast police have arrived.*".  The ad then depicts the "breastfeeding moms" with arrogant and superior appearing faces, and even disdainful mannerisms, with one of the moms proclaiming in a condescending voice, "100% breast fed - straight from the source,", and a second mom grasping her breast in a profane manner.  The negative portrayal of breastfeeding moms is subtle, but powerful, and casts the breastfeeding moms as judgmental and nasty, while portraying the bottle-feeding moms as nurturing victims.

www.youtube.com/watch?list=RDJUbGHeZCxe4&v=JUbGHeZCxe4&feature=emb_rel_end

49.     Another advertisement titled "The Judgment Stops Here,", a documentary-styled ad, is powerful and moving in that it shows moms coming together, putting aside judgment of each others' choices.  However, the ad is manipulative, deceptive and violative of the Code and Abbott's own marketing Policy, in that it puts breast milk and formula on an even playing field, and attempts to chastise any judgment that might be cast in favor or what is clear scientific judgment.  In other words, the ad attempts to insulate Similac from criticism or judgment, when criticism    is    wholly    appropriate    from    a    ——scientific    standpoint.
https://www.facebook.com/Similac/videos/1126104447462943

50.     In an Abbott advertisement for a Similac product, the ad states "when you are ready to turn to infant formula, but you don't want to compromise, look to Pure Bliss by Similac.  *It's modeled after breast milk . . .* "  www.youtube.com/watch?v=kRaHiTMyYXs

51.     Moreover, Abbott has also attempted to market its products specifically to *premature infants*, who are the infants at highest risk from the dangers of the product.

52.    In 1978, Abbott began marketing "Similac 24 LBW", specifically for premature infants, claiming that the product was "introduced to meet the special needs of premature infants."

53.    In 1980, Abbott began marketing "Similac Special Care" claiming it was the first low-birth-weight, premature infant formula with a composition designed to meet fetal accretion rates."

54.    In 1988, Abbott introduced and marketing Similac Special Care With Iron, claiming it "was the first iron-fortified formula for premature and low-birth-weight infants introduced in the US."

55.    As of 2016, Abbott marketed and sold seven products specifically targeting "Premature/Low birth-Weight Infants":

Liquid Protein Fortifier.

Similac® NeoSure®.

Similac® Human Milk Fortifiers.

Similac® Special Care® 20.

Similac® Special Care® 24.

Similac® Special Care® 24 High Protein.

Similac® Special Care® 30

56.    Upon information and belief, Abbott specifically targets parents of premature in-

fants in their marketing.  For example, a Google search "feeding preemies formula", reveals a paid advertisement on the first page for *Similac NeoSure,* with the heading "For Babies Born Prematurely.".  The web-based advertisement states "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development."  The advertisement further claims that it is "pediatrician recommended" and "#1 brand fed in Hospitals" and "backed by science.".  The advertisement makes no reference to specialized needs pre-term infants have for human breast milk, and makes no mention of the risk of developing Necrotizsing Enterocolitis.  Although it is unclear when the promotional effort began, it appears that it was at least as far back as July 24, 2015, which is the date of the first "customer review" on the website.

57.     At all relevant times, Abbott has a website "similac.com" where the mothers can choose the formula the cCorporation recommends.  The website has a tab that indicates "Need help choosing the right formula for your baby? Our Formula Finder can walk you through it".  The website prompts the question: "was your child born prematurely?".  If the mother clicks "yes,", the website directs the mother to a page located at https://similac.com/formula-finder/baby-formula/similac-expert-care-neosure-premature.  Through this website, Abbott directs mothers of premature babies to use Similac NeoSure - a cow's milk-based formula.  The page further indicates that the product is "For babies who were born prematurely.  Similac NeoSure supports excellent growth in premature babies' gains in weight, length, and head circumference when compared to these gains in preterm babies fed term formulas."

58.     In this promotional website, there is no mention of the risk of ~~necrotising~~necrotizing enterocolitis.  The promotional web page expressly and implicitly represents that its cow's milk-based products are safe for use with premature infants.  This is false and misleading.

59.     A consumer searching the following phrases on Google: (1) "Is formula healthy for premature infants"; or (2) "Is formula safe for premature infants" are shown paid advertisements by Abbott, specifically for their product *Similac NeoSure*.

https://similac.com/baby-formula/similac-expert-care-neosure-premature?gclid=Cj0KCQjw-uH6BRDQARIsAI3I-UeYjPowMASPfF9f0R0P7xM5BNJD-E-6FxOrZtsxgCYhJ75AtliM8CwaAkltEALw_wcB&gclsrc=aw.ds.

60.     This webpage makes numerous representations specific to premature infants.  For example, Similac "Promotes catch-up growth during your premature baby's first 12 months" and states that "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her *Similac NeoSure*, a nutrient-enriched formula for babies who were born prematurely, and help support her development."  There is no reference on this page to the risks associated with Abbott's product in terms of causing NEC. The promotional website misleads parents of premature infants to believe that Abbott's product is optimal for premature infants.  This is false and misleading.

61.     An Abbott advertisement states that "whether you choose to formula feed or, to supplement breast feeding with formula, you can be confident in the nourishment of Similac." The representation to parents that they can be "confident" is in direct contradiction of the studies that indicate the cow's milk-based formula is dangerous to premature infants.  Accordingly, it is

false and misleading.

62.     The website of Abbott also has reviews from mothers whose premature infants were in the NICU, and they discuss how wonderful and safe the products are.  There are no mother reviews discussing ~~N.E.C.~~NEC or death.  This is false and misleading, and is perpetuated by Abbott.  Abbott has designed a plan to induce mother~~'~~s to continue to purchase the product after leaving the NICU, at great expense.

63.     CBS news reported that Abbott paid mom bloggers to give positive reviews of Abbott products.

64.     Recognizing a shift in the medical community towards an exclusive human based diet for premature infants, Abbott began developing a product called "Similac Human Milk Fortifier".  The name in itself is misleading in that it suggests that the product is derived from human milk.  In fact, it is a cow's milk-based product.  Canvasser, J., *et al.* Parent and Provider Perspectives on the Imprecise Label of "Human Milk Fortifier" in the NICU. *Nutrients* 2020, *12,* 720.

65.     Abbott has designed a systematic, powerful and misleading marketing campaign to deceive mothers to believe that: (1) cow milk formula and fortifier is safe; (2) cow-milk products are equal, or even superior, substitutes, to breastmilk; and (3) Physicians  consider their cow's milk-based products a first choice.  Similarly, Abbott has marketed its products for premature infants as necessary for "catch-up growth", and perfectly safe for premature infants, despite knowing of the extreme risks posed by cow's milk-based products relative to the deadly disease of NEC with regard to premature infants and cow products.  Anika Hunte was exposed

to this deception, and was caused to believe this deception, all which substantially contributed to her baby being fed the defendant's cow milk products.

66. Members of the medical community, physicians, and hospitals, as well as the parents, relied upon the representations and advertising of the defendant, which categorically omit that their cow's milk-based products significantly increase the risk of NEC and death in premature infants, which contributed to the product being fed to Baby Aries.

### C. **Baby Aries and the Product**

67. Baby Aries was born extremely prematurely with a low birth weight of just over one pound (620 grams), at 27 weeks gestation.

68. The baby was placed in the Neonatal Intensive Care Unit (N.I.C.U.) at Yale New Haven Hospital.

69. Following the birth of Baby Aries, Anika Hunte (mother) successfully pumped her own breast milk, and produced a significant supply sufficient for her baby's nutrition.

70. Early morning of February 16, 2018, Baby Aries was fed a combination of Breastmilk and *Similac Neosure*. *Similac Neosure* is a cow's milk-based formula.

71. By the evening of February 16, 2018, Baby Aries was noted to have a bloody stool.

72. Baby Aries' mother and father had no knowledge that *Neosure* would increase the risk of their baby developing Necrotizing Enterocolitis.

73. Similac promotes *Neosure* on its website and other mediums as a safe prod-

uct, and one specifically needed by preemies for adequate growth. See https://similac.com/baby-formula/similac-expert-care-neosure-premature. A link on this page specifically promotes the claim that preemies need Neosure for "catchup growth". https://similac.com/baby-development/preemie/nutrition-premature-babies. This latter link specifically claims that "While breast milk is the best form of nutrition, your preterm baby's nutrient needs are greater than what breast milk alone can provide. Your baby's healthcare team may add to breast milk a "human milk fortifier" that is specially designed for babies born prematurely. It enhances mom's milk with extra protein, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." The effect of this representation is to cause the mother to believe that her breastmilk is insufficient for her premature infant.



# Specialized Nutrition For Premature Babies

## Preterm nutrition is a story of specialization



Since preterm babies start smaller, their "catch-up growth" will have to be faster than usual for the baby to become the same size as a full-term baby.

Babies born prematurely have specific nutritional needs throughout the first year as their bodies work hard to grow and develop. The right nutrition for premature babies helps them grow in ways you can see, such as weight, length, and head size. Nutrition is also vital for growth you can't see.

Whether you choose to breastfeed or use baby formula, after leaving the hospital, most preemies will benefit from nutritional supplementation or a specialized formula with nutrients that support brain, muscle, bone, and organ growth, and development of a strong immune system.

Similac® NeoSure® is clinically shown to help with catch-up growth. It supports excellent growth during baby's first year, providing increased protein, energy, vitamins, and minerals compared to term infant formula. This means extra calories for growth, as well as calcium and phosphorus for baby's growing bones.

The fat blend in Similac NeoSure is 25% medium-chain triglycerides, an easily digested and well-absorbed fat source.

Similac NeoSure supports better gains in weight, length, and head circumference when compared to standard infant formula.

Read more about the benefits of Similac NeoSure and our **NEW value-size can.** Learn more

A screenshot is of both is  captured on the following two pages.

26

# Similac® NeoSure®

## Promotes catch-up growth during your premature baby's first 12 months



★★★★☆
Read all 464 reviews
Write a review





Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient–enriched† formula for babies who were born prematurely, and help support her development.

Similac NeoSure is now available in a **NEW value-size can**, which provides over **70% more formula.***

## Supports excellent growth during baby's first year.[1]

- Increased protein, energy, vitamins, and minerals compared to term infant formula
- Extra calories for growth‡
- Calcium and phosphorus for baby's growing bones

Supports better gains in weight, length, and head circumference for premature babies when compared to term infant formula.[1] Has OptiGRO® to support your baby's brain and eye development.

Available In:


22.8-oz Powder


13.1-oz Powder


1–qt Ready to Feed


2–fl-oz Ready to Feed


NeoSure video


No Palm Oil/Palm Olein Oil

74.    This same webpage contains a video, promoting the necessity of formula as a means to achieve adequate growth in premature infants.

https://similac.com/baby-formula/similac-expert-care-neosure-premature.

75.    All this marketing and promotion is designed to instill confidence in Abbott's product lines, and indeed to plant a subtle seed in a parent's mind that formula is safe and necessary to the growth of a premature infant.

76.    Prior to baby Aries being fed *Similac Neosure*, Anika Hunte was exposed toand persuaded by marketing from Abbott that AbbottSimilac products were safe and necessary to the growth and nutrition of her premature infant.

77.    Although Abbott promotes an aggressive marketing campaign designed to make parents believe that *Neosure* is safe and necessary for growth of a premature infant, the product is in fact extremely dangerous for premature infants.  *Neosure* substantially increases the chances of a premature infant getting NEC and of dying.

78.    *Neosure* is commercially available at retail locations and online. No prescription is necessary.

7~~7~~9.      Despite knowing of the risk of NEC, Abbott did not warn parents of the risk of NEC  or ~~dying~~death associated with *Neosure*.

80.      Despite knowing of the risk of NEC, Abbott did not warn doctors, hospital, nurses and medical staff of the risk of NEC or dying associated with *Neosure*.

81.    The only warnings contained are the following:

**Safety Precautions**

- **Never use a microwave oven to warm formula.** Serious burns can result.
- Powdered infant formulas are not sterile and should not be fed to premature infants or infants who might have immune problems unless directed and supervised by your baby's doctor.

\* *Increased protein, vitamins, and minerals compared to term infant formula.*

† *Compared to infants fed a formula without DHA and ARA in a clinical trial with Similac Special Care and Similac NeoSure infant formulas with iron; prior to the addition of lutein.*

‡ *Visual acuity measured at 4 and 6 months corrected age and assessed by VEP (visual evoked potential).*

§ *Based on a subset of infants in a post-hoc analysis.*

¶ *No significant difference has been shown between milk derived from rbST-treated and non-rbST-treated cows.*

1 *Carver JD, et al. Pediatrics 2001;107:638-689.*

2 *Groh-Wargo S, et al. Pediatr Res 2005;57:712.718.*

3 *O'Connor DL, et al. Pediatrics 2001;108:359-371.*

4 *Canfield LM, et al. Eur J Nutr 2003;42:133-141.*

5 *Schweigert FJ, et al. Eur J Nutr 2004;43:39-44.*

6 *Patton S, et al. Lipids 1990;25:159-165.*

7 *Rubin LP, et al. J Perinatol 2012;32:418-424.*

82.    On or about February 22, 2018, the product, *Similac Human Milk Fortifier*, was introduced to the baby and feeding of this product continued thereafter.

83.    Notwithstanding its name, *Similac Human Milk Fortifier* is not derived from human milk.  Rather, it is a bovine-derived product.

84.    *Similac Human Milk Fortifier* substantially increases the chances of a premature

infant developing NEC.

85.    Baby Aries was fed *Similac Human Milk Fortifier* from February 22, 2018 through February 26, 2018.

86.    Baby Aries' parents were told by hospital staff that their baby would receive *Similac Human Milk Fortifier* as a supplement to mom's own breastmilk.

87.    Baby Aries' parents did not know that *Similac Human Milk Fortifier* was derived from cow's milk. The name, "Human Milk Fortifier" is misleading and causes consumers to believe that it is a human milk derived product.

88.     Baby Aries's parents did not know *Similac Human Milk Fortifier* put their baby at increased risk of NEC and death.

89.    The product, *Similac Human Milk Fortifier*, contained only the following packaging information guidelines, instructions and warnings:

# Similac® Human Milk Fortifier Concentrated Liquid

- Intended for premature and low-birth-weight infants as a nutritional supplement to add to human milk.
- Use under medical supervision.
- Small, convenient packet is designed for easy mixing.
- When added to human milk, meets the nutrient recommendations for the premature infant.[1]
- Commercially sterile and meets the ADA and CDC recommendation to use liquid for NICU feedings.[2,3,*]
- Packet is simple to open and mixes easier with human milk than powder.[4]
- Low iron level provides flexibility to add iron as needed.
- Halal.
- Kosher.



## Safety Precautions

- Add only to human milk - do not add water.
- This product is nutritionally incomplete by itself and is designed to be added to human breast milk.
- Additional iron may be necessary.
- Tolerance to enteral feedings should be confirmed by offering small volumes of unfortified human milk.
- Once enteral feeding is well established, Similac Human Milk Fortifier Concentrated Liquid can be added to human milk.
- **Never use a microwave oven to warm feedings. Serious burns can result.**

*American Dietetic Association and Centers for Disease Control and Prevention*

[1] *Klein CJ. J Nutr 2002;132(6):1395S-1577S.*

[2] *Centers for Disease Control and Prevention. Enterobacter sakazakii infections associated with the use of powdered infant formula—Tennessee, 2001. Available at http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5114a1.htm. Accessed March 10, 2016.*

[3] *Pediatric Nutrition Practice Group, Robbins ST, Myers R. Infant Feedings: Guidelines for Preparation of Formula and Breastmilk in Health Care Facilities. ed 2. Chicago: American Dietetic Association, 2011.*

[4] *Data on file, 2010. Abbott Nutrition Market Research, Abbott Laboratories, Columbus, Ohio.*

90.     Despite knowing that *Similac Human Milk Fortifier* increases the risk of NEC and death, Abbott did not warn the parents or the medical providers of NEC or death, nor did it provide any instructions or guidance on how to avoid NEC or death.

91.     On February 25, 2018, Baby Aries was first fed *Similac Special Care.*

92.     *Similac Special Care* is a cow's milk-based formula.

93.     Abbott promotes *Similac Special Care* to parents, physicians, hospitals and medical staff as a safe product, and one specifically needed by preemies for adequate growth.

94.     Upon information and belief, *Similac Special Care* is (or was) available for purchase directly by the consumer at the retail level.

95.     Despite knowing that *Similac Special Care* increases the risk of NEC and death, Abbott did not warn the parents or the medical providers of NEC or death, nor did it provide any instructions or guidance on how to avoid NEC or death.  The product, *Similac Special Care,* contained the following "precautions":

"Similac Special Care 20 - Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the in-

testinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician"

"Similac Special Care 24 – Precautions:

• Very low-birth weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician"

"Similac Special Care 24 High Protein – Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Tolerance to enteral feedings should be confirmed by initially offering small volumes of formula followed by cautious progression to higher caloric feedings
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the intestinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be
slowed or discontinued.
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician

"Similac Special Care 30 – Precautions:

• Very low-birth-weight infants are particularly susceptible to gastrointestinal complications; therefore, feeding should be initiated cautiously
• Use this product only after feedings of lower caloric density are well-established. For improved tolerance, it is best to increase caloric density slowly, by 2- to 4-Cal/fl oz increments
• Hydration status should be monitored
• Spitting up, abdominal distention, abnormal stools or stool patterns, excessive gastric residuals, or other signs of intestinal dysfunction have been associated with enteral feeding before the in-

testinal tract is ready to accommodate the regimen. At the first sign of these problems, enteral feeding should be slowed or discontinued
• Not intended for feeding low-birth-weight infants after they reach a weight of 3600 g (approximately 8 lb) or as directed by a physician"

"Similac Special Care Premature 20 calorie and 24 calorie and High Protein - Precaution:
·    If signs of intolerance develop, slow feeding or discontinue.
·    Not intended for low-birth-weight infants after they reach a weight of 3600 grams (approx.. 8 lb) or as directed by a doctor."

"Similac Special Care Premature 30 calorie – Precaution:
·    Use once feeding tolerance is established
·    If signs of intolerance develop, slow feeding or discontinue.
·    Hydration status should be monitored
·    Not intended for low-birth-weight infants after they reach a weight of 3600 grams (approx.. 8 lb) or as directed by a doctor."

―――――

96.    Abbott does not warn the user, the parents, or the physicians that its products (*Similac Neosure, Similac Human Milk Fortifier* and/or or *Similac Special Care*) cause NEC or death, nor provides guidance on how to avoid NEC or death while using its products.

97.    The cow's milk-based formula products, *Similac Neosure, Similac Human Milk Fortifier* and/or or *Similac Special Care* are dangerous to premature infants in that itthey significantly increases the risk that the baby will develop NEC.

98.    The cow's milk-based formula products, *Similac Neosure, Similac Human Milk Fortifier* and/or or *Similac Special Care*, are dangerous to premature infants in that itthey significantly increases the risk that the baby will die.

99.    The defendant, Abbott failed to properly warn parents and medical providers that its products, *Similac Neosure, Similac Human Milk Fortifier* and/or or *Similac Special Care*, can

significantly increase the risk that the premature infant will develop ~~N.E.C.~~NEC and/or death, failed to design said products such as to make them safe, and deceived the public, parents, physicians and medical staff into believing that the products were ~~was~~ a safe and necessary alternative, supplement and/or and substitute to human milk.

100.   Despite knowing that its products were being fed to premature infants without the parents' informed consent, Abbott failed to require or recommend that Hospitals inform the parents of the significant risks, and to require that the consent of the parent be obtained prior to feeding it to babies.

101.   The defendant, Abbott Laboratories, Inc.'s cow's milk-based formula products did cause Baby Aries to develop NEC, which triggered severe intestinal disease and death to Baby Aries.

**Safer Alternative Designs**

102.   The products made from cow's milk, specifically for premature infants by Similac, are unsafe to premature infants and are avoidable for use in that there is human donor milk available and/or human milk derived fortifier products available made from human milk instead of cow's milk.

103.   *Neosure, Similac Human Milk Fortifier* and *Similac Special Care* are not "unavoidably unsafe" products.  Indeed, scientific knowledge and feasibility has for decades permitted the design of a product derived exclusively from human milk without diminishing its utility, safety and effectiveness.

104. Since 2006, Prolacta Bioscience has manufactured and sold premature infant fortifiers and formulas which contain no cow's milk, but rather 100% human donor milk. This product is an example of a feasible alternative design. These alternative designs provide all the necessary nutrition and growth that bovine formula provides, without the deadly effects.

~~96~~105. Based upon information and belief, Abbott was aware of the increased risk of NEC and death associated with its cow's milk based products and instead of warning of the dangers, or removing them altogether, Abbott has attempted to reduce the harmful effects of cow milk based products through research and design, but has stubbornly insisted on continuance of cow's milk as the foundation of its products.

106. Abbott is aware of the increased risk of NEC associated with the use of cow's milk as opposed to human milk. As a result, Abbott has attempted to remedy its defective product by researching and developing products that mimic human milk by: a) creating probiotics which are similar to mother's milk, b) developing human milk oligosaccharides that are found in mother's milk, and c) attempting to hydrolyze cow's milk proteins to make them easier to digest and resist infection. Despite these developments, Abbott has continued to market and produce its cow's milk-based products without any instructions or warnings to reduce the risk of NEC in premature infants.

**COUNT ONE: (PRODUCTS LIABILITY AS TO ABBOTT LABORATORIES, INC.)**

107. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Prior to January 30, 2018, the defendant, Abbott Laboratories, Inc. was aware, or should have been aware, that its products were not safe for use, as they were used, in the premature infant, Baby Aries, and that there existed an alternative design — yet it took no steps to prevent its use in such a situation.

109.    The defendant, Abbott Laboratories, Inc. did foresee, or should have foreseen, that its products would be used, as they were in the case of baby Aries, and knew or should have known, that such use would significantly increase the risk of NEC and death in Baby Aries, yet it took no steps to prevent such use.

110.    The products, *Similac Neosure, Similac Human Milk Fortifier, and Similac Special Care* were not safe to be used as they were in the case of Baby Aries and the defendant knew or should have known they waswere unsafe, yet it failed to provide any instructions or guidelines on when and how its product would be safe to use in a premature infant like Baby Aries.

111.    The defendant, Abbott Laboratories, Inc, has marketed their products as safe and beneficial for premature infants like Baby Aries.

112.    The defendant, Abbott Laboratories, Inc. has promoted their product for extremely premature infants and claim its product increases the babies' weight and caloric intake and its product is more beneficial than harmful.

113.    The Defendant Abbott Laboratories, Inc. has advanced the false premise to parents, physicians and medical staff that human milk is not sufficient to meet the nutritional needs

of premature infants, and the equally false premise that their products are necessary as either substitutes and/or supplements to human milk.

114.    Science and research have unequivocally established the dangers of the defendant, Abbott's, cow's milk-based product in causing NEC and death in premature infants, yet the defendant did nothing to change its product, packaging, guidelines, instructions and warnings.

115.    Science and research have unequivocally established the dangers of the defendant, Abbott's, cow's milk-based product was causing NEC and death in premature infants, yet the defendant did not conduct any testing, data analysis, or research to determine when its product should not be used or when and how its product was safe for use.

116.    Scientific studies show that the Abbott products should not be sold for use in extremely premature infants, yet Abbott continued to market and sell its products under its ubiquitous brand name "Similac" knowing it would be used on infants like Baby Aries and knowing its product would significantly increase the risk of NEC and death in extremely premature infants like Baby Aries and knowing that its marketing over decades had created a false sense of safety to both doctors and parents.

117.    Abbott knew or should have known that its products would be used in the way it was used on this baby.

118.    The way in which the Abbott products were fed to the baby was extremely dangerous and caused an unreasonably high risk that the baby would develop NEC and die, yet Abbott provided no detailed instructions or warnings to prevent or alter the way this product was

used.

119.    Despite learning that its products were linked to NEC and death, Abbott

failed to properly collect data from patients, parents, doctors and hospitals in order to develop

~~evidence~~ evidence-based strategies, instructions, and warnings to reduce or prevent its product

from causing NEC and death.

120.    Despite knowing its products were leading to NEC and death, Abbott took

no steps to determine how or why its products were causing NEC or death.

121.    The defendant, Abbott Laboratories, Inc. has learned that its cow's milk-based

products were causing NEC and death in premature infants, yet the defendants did nothing to

change its products, packaging, guidelines, instructions and warnings.

122.    Despite knowing that its cow's milk-based products were causing NEC and

death in premature infants, the defendant, Abbott Laboratories, Inc. did not conduct any testing,

data analysis, or research to determine when its product should not be used or when and how its

product was safe for use.

123.    Despite knowing that its cow's milk-based products were leading to NEC and

death, Abbott took no steps to determine how or why its product was causing NEC or death, nor

did it conduct a comprehensive risk management plan to combat the tragic end results of using

its products.

124.    Despite knowing for many years that numerous scientific studies were showing

horrible adverse affects of its Similac products in premature infants, the defendant Abbott failed

to undertake a rigorous risk management plan, periodic safety update reports, periodic benefit-risk reports, and development safety reports.

125.    Despite knowing that its products were causing NEC and death in premature infants, the defendant, Abbott Laboratories, Inc. did not contact the FDA, NICUs, hospitals, and/or to inform them its product was linked to causing NEC and death.

126.    Baby Aries' parents, physicians and medical staff were never told that the formula could cause their baby to develop N.E.C.NEC and death.

127.    Baby Aries' parents, physicians and medical staff were never told that the formula could cause their baby to die.

128.    Baby Aries' parents, physicians and medical staff were never told of the studies showing cow's milk-based formula was extremely dangerous to their baby.

129.    Baby Aries' parents, physicians and medical staff were never told of the studies showing human donor milk was safer for their baby.

130.    Baby Aries' parents, physicians and medical staff were never told of the studies showing that an exclusive human milk diet is sufficient to meet all growth and nutritional goals.

131.    Despite knowing that its cow's milk-based products were causing NEC and death in premature infants, Abbott Laboratories, Inc. did not recommend or require hospitals, NICUs or physicians that they should discuss the risks of NEC or death with the parents.

132.    Despite knowing that its products were causing NEC and death in premature infants, the defendant, Abbott Laboratories, Inc. did not contact the FDA, NICUs,

hospitals, and physicians to inform them its cow's milk-based product was linked to causing NEC and death.

133. The parents were aware Similac products were being fed to their baby.

134. Because the brand name "Similac" is marketed as safe and healthy and similar to breast milk, and is regularly sold in stores and used in hospitals, the parents did not question the safety of the product.

135. The parents had been strong advocates involved in their infant's care throughout his life.

136. The parents wanted to know and desired to be participants in all decisions regarding the health and safety of their son and wanted to be provided an informed choice on all risks and benefits of medical care and treatment. Because Abbott willingly, pervasively, and directly persuaded Baby Aries' parents of the claimed safety and necessity of its product through direct-to-consumer marketing, the parents allowed Similac to be fed to their infant. Abbott was obligated to correct this misperception when it became scientifically established that the information it relayed was false and harmful.

137. Had either one of the parents known of the significant risks of feeding Similac to their premature infant, they would not have allowed the products to be fed. Similarly, had either parent not been exposed to this pervasive marketing, convincing them of Similac's safety and necessity, they would not have allowed the product to be fed.

138. Neither the hospital nor the physicians involved in the care of the infant

informed either parent that Similac cow's milk-based products could significantly increase the risk of NEC or death in their infant.

139.    The hospitals and physicians involved in the infant's care never informed the mother or father that Similac cow's milk-based products could significantly increase the risk of NEC or death to their son.

140.    Neither the hospital nor the physicians provided a choice to the mother or the father to feed their premature infant cow's milk-based fortifier or formula. This practice of not telling the parents of the risks of feeding cow's milk-based Similac formula or fortifier is the common practice throughout the country. Abbott is aware of this practice and is aware that parents are rarely, if ever, informed.

141.    Defendant Abbott has known for many years that its premature infant products, Similac, are significantly increasing the risk of premature infants developing NEC and dying and are aware that hospitals and physicians around the United States are not informing the parents of this risk of NEC developing when fed their formula.

142.    Abbott knows that if they required or even requested the hospitals or doctors to obtain an informed consent regarding the risks of feeding their products to their premature infant patients, the parents would not allow Similac to be fed to their children.

143.    Abbott knows that if they required or even requested on their product labels that their premature infant formulas, Similac, should not be fed to a premature infant until the parent is warned and informed that feeding a product could significantly increase the risk of

NEC or death, then the use of the Similac products would immediately plummet in hospitals across the country because the truth and the science would finally be brought to light, and the parents would not allow the products to be fed to their infant.  The brand name Similac would forever be associated with NEC and death to the detriment of the corporate image of Abbott.

144.    If the hospital or physicians had informed either parent, or if Abbott had required or even requested the hospitals or physicians inform the parents that the Similac products for premature infants could significantly increase the risk of NEC or death to their daughter, the parents would not have allowed the cow's milk-based products to be fed to their infant and Aries Peterson would not have suffered NEC and would have survived.

145.    Abbott provides free or low-priced products to the hospital, which encourages the products to be overused with no warnings, instructions and/or consents.

146.    For decades, Abbott has known that there is a complete lack of communication between physicians and parents when it comes to the feeding of the defendant's Similac products to preterm infants. Abbott has done nothing to fix this dangerous practice of silence. Unfortunately the effect of this practice is that premature infants have been needlessly succumbing to NEC and dying after being fed the defendant's products and the parents have no idea why.

147.    Baby Aries parents, like most parents who have lost their child to NEC after being fed cow's milk-based fortifiers or formulas, were never informed why their child developed NEC, and the hospital and its staff never advised the parents of the probable cause being Similac. Despite many years of premature infants developing NEC or dying after being fed

Similac, parents remain completely in the dark as to the cause of their child's injury or loss and are not told of the abundance of data linking Similac to NEC and/or death.

148.    The FDA requires manufacturers of prescription medications to study their medications and perform drug trials and collect data to determine the safety and efficacy of their drugs and to determine the likelihood of side effects and to continuously study the drug's use to review adverse outcomes and create proper warnings and instructions; however because baby formulas, such as Similac, are not drugs, the manufacturer, Abbott is not adequately performing such trials or properly collecting data on when and how the formula should be fed. Despite knowing for decades that the products are significantly increasing NEC and/or death in premature infants, and are far more dangerous than most prescription drugs, Abbott has failed to stop or lessen NEC and/or death.

149.    If Abbott had performed the pharmacovigilance required by drug manufacturers for their premature infant formulas and fortifiers, these products would not have been fed to Aries Peterson and he would not have developed NEC and he would have survived.

150.    If hospitals and physicians had been provided full disclosure of the data and science regarding the risks of NEC and death, or when it occurs, or instructions on how to avoid that (as if it were a drug), or a statistical data-based risk-benefit analysis, or were required or requested by the manufacturers to inform the patient as is ethically required with drugs, then Similac would not have been fed to Aries Peterson and he would not have developed NEC nor died but would have survived.

151.    The manufacturer Abbott has known that their Similac products are significantly increasing the risk of NEC and/or death in premature infants and are aware that there are alternatives to their cow's milk-based formulas and fortifiers, such as human milk derived products, that would reduce the risk of NEC and/or death, yet they chose to continue to promote, market, and sell their products, causing thousands of premature infants to succumb to NEC and die.

152.    The defendant, Abbott Laboratories, Inc., is liable to the plaintiff under the Connecticut Product Liability Act, Conn. Gen. Stat. Section 52-572m, et seq. in one or more of the following ways:

A.  Failure to Warn and/or Instruct

    a.  The defendant knew or should have known that its cow's milk-based premature infant products would be used, as it was, on extremely premature infants like Baby Aries, yet it failed to properly warn hospitals, NICUs, doctors, parents and/or consumers that its cow's milk-based product significantly increases the risk of NEC and death in these babies; and/or

    b.  Was unsafe and/or contra-indicated for extremely premature infants and low birth weight babies like Baby Aries; and/or

    c.  Failed to provide proper instructions or guidelines or studies, or data on when and how to feed its products to premature infants in order to decrease the risk of NEC and/or death; and/or

    d.  Failed to insert a warning or instruction that parents needed to be provided an informed choice between the safety of human milk versus the dangers of the defendant's cow's milk-based product; and/or

    e.  Failed to provide instructions that parents and physicians that the defendant's products carried a significant risk that its cow's milk-based product could cause their baby to develop NEC and die; and/or

    f.  The warnings and instructions are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn on cow's milk-based formula significantly increasing the risk of NEC and death or providing any details on how to avoid such harm; and/or

    g.  Failed to have a large and prominent "black box" type warning that its cow's

milk-based products are known to significantly increase the risk of NEC and death when compared to Human Milk in premature infants; and/or

h.  Failed to provide well researched and well-established studies that linked its cow's milk-based product to NEC and death in premature infants;

i.  Failed to cite to or utilize current up-to-date medical data on the proper and safe use of its product; and/or

j.  Failed to otherwise warn physicians and healthcare providers of the extreme risk associated with feeding premature infants cow's milk-based formula; and/or

k.  Had physicians and healthcare providers known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would have not used such a dangerous product; and/or

l.  Failed to send out "Dear Dr." letters warning of the risks of NEC and death and the current scientific research and data to better guide the the hospitals and physicians to better care for the extremely premature infants; and/or.

m. Failed to advise physicians and healthcare providers that cow's milk-based products are not necessary to achieve growth and nutritional targets for premature infants; and/or

n.  Failed to advise physicians and healthcare providers that human milk is superior to cow's milk-based products with regard to the overall health of a premature infant; and/or

n.o. Failed to instruct or warn that an exclusive human milk based diet significantly decreases the risk of NEC when compared to a cow's milk diet; and/or

o.p. Failed to advise physicians and healthcare providers that Prolacta is a better alternative to cow's milk-based fortification;. and/or

p.q. Despite knowing that parents were not being warned of the risk of NEC by their physician, failing to take adequate measures to warn the parents directly; and/or

q.  Defendant's massive marketing campaign as detailed in previous paragraphs has had the effect of:  (1) diminishing the ability of parents to intelligently resist the decision of a healthcare provider to give formula; (2) diminished mom's desire and sense of import to breastfeed; (3) diminished the relationship between physician and patient relative nutritional decision-making; (4) made it more difficult for a physician to persuade a mother to breastfeed; (5) made it easier and more economically viable for hospitals to feed preemies formula over donor milk or human milk-derived fortifiers; and/or

r.

s.r. Failed to instruct physicians not to feed infants under 1,000 grams; and/or

t.s. Failed to instruct physicians on when or how to transition to 100% cow's milk-based formula; and/or

u.t. Failed to require or recommend hospitals and/or physicians inform parents
that their product significantly increases the risk of NEC and death before al-
lowing the product to be fed to their premature infants; and/or

v.u.Failed to provide a thorough and detailed risk-benefit analysis for hospitals,
doctors, and parents; and/or

a. Failed to develop a protocol for hospitals and physicians with the elements to
assure safe use; and/or

b.  Failed to provide detailed and adequate instructions on proper use, admin-
istration, application, and limitations of its products specifically designed for
premature infants; and/or

v.  Failed to provide periodic or yearly safety reports; and/or

w.  Failed to provide periodic or yearly risk-benefit analysis for use of its prod-
uct; and/or

x.  Failed to provide or produce yearly safety update reports; and/or

w.y.     Failed to develop comprehensive mitigation strategies to reduce the risk
of N.E.C. and death in its products specifically designed for premature in-
fants; and/or

x.z.Failed to establish a label or instruction that would correspond to the current
science regarding the positive risk-benefit profile; and/or

y.aa.     Failed to provide statistical evidence of adverse effects regarding the feed-
ing of its product; and/or

z.bb.    Failed to guide or instruct on when to start, how much to start, how to in-
crease, volume and timing of feeds, when not to feed, and/or when to stop
feeding its product to premature infants; and/or

aa.cc.   Failed to guide or instruct on how to properly monitor a preterm infant
who is fed the product; and/or

bb.dd.  Failed to condition the products sale or delivery to the hospital with the
assurance that the hospital would issue proper warnings of NEC and death to
the parents and/or.

cc.ee.   As a result of the inadequacy of the warnings and the pervasive marketing
suggesting the safety and necessity of their products, Baby Aries was fed
cow's milk-based products which caused him to develop NEC and ultimately
die.

dd. As a result of the failures to warn as aforementioned, Baby Aries developed
NEC and died.

ff.

B.  Strictly Liable for Defective Product

a.  Unlike drugs and medical devices, *Neosure* did not at all relevant times re-
quire FDA "approval" prior to entering market;

b. Unlike drugs and medical devices, *Similac Human Milk Fortifier* did not at all relevant times require FDA "approval" prior to entering the market;

c. Unlike drugs and medical devices, *Similac Special Care* did not at all relevant times require FDA "approval" prior to entering the market;

d. Unlike drugs and medical devices, *Neosure* did not at all relevant times require FDA "approval" before making a "change" to the design or formulation of the product;

e. Unlike drugs and medical devices, *Similac Human Milk Fortifier* did not at all relevant times require FDA "approval" before making a "change" to the design or formulation of the product;

f. Unlike drugs and medical devices, *Similac Special Care* did not at all relevant times require FDA "approval" before making a "change" to the design or formulation of the product;

g. Replacing cows' milk with human milk in *Neosure, Similac Human Milk Fortifier and Similac Special Care* would not result in adverse impact on levels of nutrients or availability of nutrients.  Therefore, the products did not require FDA notification prior to making any changes;

h. Even if FDA notification were required, which plaintiff maintains it was not, nothing in the Infant Formula Act would prevent Defendant from making the substitution as required by the Connecticut Product Liability Act;

i. Defendant's defective design revolves around its insistence on using cow-milk for its products.  Human milk could have feasibly, although less profitably, substituted the cow milk.  Such a change would not have resulted in an "adverse impact on levels of nutrients or availability of nutrients" pursuant to 21 C.F.R. § 197.50(b)(4).  Consequently, no FDA submission, notification, or approval was required under Federal law prior to changing the product;

j. Defendants products were defectively designed as aforementioned;

k. Defendants products were unreasonably dangerous as aforementioned;

l. Over the last several years, scientific data and well researched studies have concluded that the cow's milk-based products of the defendant carried unreasonable risks of NEC and death, which far outweighed the products' benefits;

m. The product risk of causing ~~Necrotising~~Necrotizing Enterocolitis was extreme, and substantially deviated from consumer expectation;

n. Failed to develop a human-based milk product which was safer for extremely premature infants;.

o. As a result of the defective design of the product, Baby Aries developed NEC and died;.

p. The defective design was the proximate cause of Baby Aries suffering NEC, and the proximate cause of his death; and.

~~q.~~ Failed to properly reformulate its product to reduce the risks of NEC and death

q.

Pre-FDA Submission - Strict Liability

r. For Decades, Defendant knew or should have known that infant formula and fortifier containing bovine milk was extremely dangerous to prematurely born infants in that it placed them at increased risk of getting Necrotizing Enterocolitis;

s. Defendants products were unreasonably dangerous as aforementioned *before* they were ever submitted to the FDA and *prior* to entering the market;

t. Specifically *Neosure* was defective *prior* to entering the market, and/or defendant knew or should have known it was defective *prior* to entering the market.

u. Specifically, *Similac Human Milk Fortifier* was defective prior to enter the market and prior to being submitted to the FDA, and/or defendant knew or should have known it was defective prior to entering the market.

v. Specifically, *Similac Special Care* was defective prior to enter the market, and prior to being submitted to the FDA, and/or defendant knew or should have known it was defective prior to entering the market.

v.

Causation and Damages.

w. The defective product was the proximate cause (a substantial factor) of Baby Aries' necrotizing enterocolitis, pre-death pain and suffering, and death.

C.  Negligence

Despite knowing that its products significantly increased the risk of NEC in premature infants, the defendant was careless and negligent and failed to act as a reasonably prudent manufacturer of premature infant formula in one or more of the following ways:

a. FFailing to collect data to determine if its products were safe for premature infants; and/or

b.

c.b. FFailing to collect data to determine when and how its products could be used safely; and/or

d.

c.   ~~F~~Failing to utilize the significant peer reviewed research to develop instructions and/or warnings on how and when its products should be used in order to protect babies from NEC and death; and/or

d.   Continuing to utilize outdated and ineffective instructions and warnings knowing they were inadequate based in modern science; and/or

e.   Failing to continuously and vigorously study its cow's milk-based products in order to avoid NEC and death in premature infants; and/or

~~f.~~

f.   Failing to develop evidence-based guidelines or instructions to decrease the risk of its products causing NEC and death; and/or

g.   Failing to develop a protocol for hospitals and physicians with the elements to assure safe use; and/or

~~g.~~h. Failing to establish a standard for safe use; and/or

~~h.~~

~~D.   Failing to provide evidence-based guidelines or instructions to decrease the risk of its products causing NEC and death; and/or~~

~~a.~~i.   Failing to stop or deter its products from being fed to extremely premature infants like Baby Aries; and/or

~~b.~~

j.   Failing to provide evidence based instructions or guidance on when or how an extremely premature infant should be transitioned to the defendant's product; and/or

k.   Failing to properly and thoroughly identify the hazards associated with its products to minimize its risks to premature infants

l.   Failing to guide or instruct on how to properly monitor a preterm infant who is fed he product; and/or

m.  Failing to guide or instruct on when to start, how much to start, how to increase, volume and timing of feeds, when not to feed, and/or when to stop feeding its product to premature infants; and/or

n.   Failing to provide detailed and adequate instructions on proper use, administration, application, and limitations of its products specifically designed for premature infants; and/or

o.   Failing to take reasonable steps to protect premature infants from developing N.E.C. and death when feeding their products; and/or

~~c.~~p. Failing to properly work with physicians and hospitals on developing ways to reduce N.E.C. and death when its products were fed to premature infants; and/or

~~d.~~

~~E.~~

52

q.   Failing to send out letters with warnings to hospitals, NICUs and doctors that its products were significantly increasing the risk of NEC and death in premature infants; and/or

a.r. Improperly promoting and marketing its Similac brand for premature infants to physicians as safe and necessary for growth when in fact, its product was extremely dangerous; and/or

b.   Negligently promoting the notion that Defendants products were necessary to promote "catchup growth"; and/or

s.

t.   Failingto instruct or warn that an exclusive human milk based diet significantly decreases the risk of N.E.C. when compared to a cow's milk diet; and/or

c.

d.u. Failing to send out letters with instructions to hospitals, NICUs and doctors on when and how its products should be used to avoid NEC and death; and/or

e.

f.v. Failing to market and/or sell its products in a way which would protect the premature infants from NEC and death; and/or

g.

h.w.   Failing to provide proper training or information to health care providers for safe use of its products; and/or

i.

x.   Failing to take reasonable precautions to prevent premature infants from developing NEC or dying; and/or

j.y. Failing to develop or reformulate its product to make it safer for premature infants; and/or

k.

l.z. Failing to develop a human milk based premature infant formula/fortifier; and/or

m.

n.aa.   Failing to properly or promptly notify the FDA that its cow's milk-based product was significantly increasing NEC and death in premature infants; and/or

o.bb.   Failing to notify the FDA and medical providers that Defendants products were not necessary for "catch-up growth"; and/or.

p.

cc. Despite knowing that NICU's and physicians were not warning of the risk of NEC, failed failing to require or recommend that hospital warn of such; and/or

dd. Despite knowing for many years that the most vulnerable humans were suf-

fering extreme harm related to the feeding of its products, failing to properly perform a type of pharmacovigilance for the scientific process of collection, detection, assessment, monitoring, and prevention of adverse effects for its premature baby formula and fortifiers; and/or

q.   .

r.ee.   Failing to exercise proper pharmacovigilance for a product which was significantly more dangerous than most prescription drugs; and/or

ff.  Improperly creating agreements with hospitals whereby its products would be over utilized to the detriment of the premature infants; and/or

gg. Improperly promoting continued use of its product in hospitals despite knowing of the great harm it was causing; and/or

hh. Improperly providing free and/or reduced price Similac products to hospitals which has caused significant harm to premature infants across the United States; and/or

ii.  Failing to properly work with the FDA on developing ways to reduce N.E.C.NEC and death when it's products were fed to premature infants; and/or

s.jj. Failed to establish a label or instruction that would correspond to the current science regarding the positive risk-benefit profile; and/or

kk. Failing to provide a thorough and detailed risk-benefit analysis for hospitals, doctors, and parents; and/or

ll.  Failing to provide statistical evidence of adverse effects regarding the feeding of its product; and/or

mm.    Failing to provide periodic or yearly safety reports; and/or

nn. Failing to provide periodic or yearly risk-benefit analysis for use of its product; and/or

oo. Failing to provide or produce yearly safety update reports; and/or

pp. Failing to develop comprehensive mitigation strategies to reduce the risk of NEC and death in its products specifically designed for premature infants; and/or

t.qq.    Intentionally promoting a culture of silence whereby the harmful effects of its products were never being communicated to the parents or the public; and/or

u.rr.    Despite knowing that Hospitals and NICU's were failing to provide adequate warnings to parents, Defendant failed to condition the products sale or delivery to the hospital with the assurance that the hospital would issue proper warnings of NEC and death to the parents; and/or.

The above stated negligence was the proximate cause of Baby Aries getting NEC, and the proximate cause of his death.

v.   The above stated negligence was the proximate cause (substantial factor) of

> Baby Aries getting NEC, and the proximate cause of his death.
>
> ss.

**F.D.    Negligent Misrepresentation**

    a. This "theory" of liability is presented under the Connecticut Product Liability Act.  The Connecticut Product Liability Act, C.G.S. Sec. 52-572m(b), specifically defines a "product liability claim" to include theories of  "misrepresentation or nondisclosure, whether negligent or innocent." as amongst those theories properly subsumed by the Product Liability Act.  Accordingly, "Negligent Misrepresentation" is included as a "theory" of liability within the CPLA count.

    b. The allegations contained in previous paragraphs set forth *specific* representations Abbott has made to consumers, physicians and medical staff through its advertising and promotional materials (some of which are actually inserted above).  The allegations contained in those paragraphs are incorporated herein.  Upon information and belief said representations were made by Abbott on an ongoing and repeated basis, and specifically relevant here, at various points between January 1, 2018 and February 22, 2018.prior to the baby being fed Abbott products.

    c. The defendant misrepresented that its cow's milk-based products were safe and beneficial for premature infants when it knew or should have known that its products were unreasonably dangerous and caused NEC and death in premature infants.

    d. The defendant misrepresented to parents, physicians and healthcare providers that its cow's milk-based products were necessary to the growth and nutrition of premature infants, when it knew or should have known that its products were not necessary to achieve adequate growth.

    e. Defendant misrepresented that its Products have no serious side effects, when it knew or should have known the contrary to be true.

    f. Defendant negligently misrepresented that cow's milk-based products are safe for premature infants;

    g. Defendant negligently misrepresented that cow's milk-based products are necessary for optimum growth; and

    h. Defendant negligently misrepresented that cow's milk-based products are similar or equivalent to human milk.

    i. Defendant negligently used the brand "Human Milk Fortifier", which suggests to average consumers that the product is derived from human milk.

    j. The aforementioned misrepresentations were the proximate cause of Baby Aries getting NEC, and the proximate cause of his death.

    k. Defendant, at all relevant times should have known, based on existing studies,

that marketing of formula negatively impacts a mother's decision to lactate and produce her own milk.

l. Despite ample evidence whereby defendant should have known that cow milk based formula is not a suitable alternative to breastmilk, Defendant has marketed its product as a suitable alternative.

m. Despite ample evidence whereby Defendant should have known that cow milk based formula significantly increases the risk of a premature infant developing Necrotizing Enterocolitis, Defendant has marketed the product as safe for premature infants.

n. Despite ample evidence whereby Defendant should have known that cow milk based products are not necessary to the adequate growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

o. Despite ample evidence whereby Defendant should have known that cow milk based products are not necessary to the adequate growth of a premature infant, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

p. Despite ample evidence whereby Defendant should have known that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

q. Despite ample evidence whereby Defendant should have known that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

r. Baby Aries' mother was exposed to some of the marketing described in "marketing" section above portraying cow milk–based products as a reasonable alternative to breastmilk.

s. Baby Aries' mother was exposed to some of the marketing described in "marketing" section above portraying cow milk–based products as necessary for premature infants for "catch-up growth".

t. Baby Aries mother was enticed into joining *Similac Strong Moms Rewards*, which entices mothers with coupons, other gifts, and what Abbott claims is "nutrition guidance for you and your baby".  Once a mother joins this group, Abbott gains access and knowledge about the member, all which Abbott uses to more effectively and in targeted fashion persuade the user towards its products and misinform the user of the purported benefits of the product.

u. Anika Hunte was enticed by the coupons, the gifts and the belief she would receive valuable educational material as a result of her membership in *Similac Strong Moms.*  As a result of this membership, Abbott gained access to sub-

56

stantial private information that helped Abbott target its marketing efforts at Anika Hunte.  For example, Abbott was aware that Anika Hunte was pregnant and that she was in her 27th week, getting ready to enter her third trimester.

v.  On January 18, 2018, Anika Hunte, was hospitalized, expecting the premature birth of Baby Aries.  At this time, she was aware that she was imminently to deliver and extremely premature baby.  She was mentally and physically exhausted, and was particularly susceptible to influence, disinformation and deception.  On said date, while hospitalized, Anika Hunte received an email from Abbott (Similac StrongMoms).  The email is designed to build a relationship with the expectant mother and instill trust in Similac products.  The email contains various links which are designed to message the quality of Abbott's brands and control the message regarding the nutritional needs of babies.

w.  As a result of the marketing and representations described above, Baby Aries' mother was caused to believe that formula was a suitable alternative to breast milk.

x.  As a result of the marketing and representations described above, Baby Aries' mother was caused to believe that formula was safe for premature infants.

y.  As a result the marketing and representations described above, Baby Aries' mother was caused to believe that formula was necessary for the growth of the premature infants.

z.  As a result of the marketing and representations described above, Baby Aries' mother was rendered less motivated and less determined to resist the decision of her physicians to feed her baby cow based products.

aa.  As a result of the marketing and representations described above, Baby Aries' mother was rendered less capable of engaging in informed consent regarding the care and nutrition of her child.

bb. As a result of the marketing and representations described above, Baby Aries mother was rendered a less effective advocate for the medical decisions being made for her child.

___

___

Intentional Misrepresentation

The allegations contained in previous paragraphs set forth specific representations Abbott has made to consumers, physicians and medical staff through its advertising and promotional materials (some of which are actually inserted above).  The allegations contained in those paragraphs are incorporated herein.  Upon information and belief said representations were made by Abbott on an ongoing and repeated basis, and specifically relevant here, at various points between January 1, 2018 and February 22, 2018.

~~The defendant knew that its representations claiming its products were safe were false.~~
~~The defendant knew that its product placed premature infants at significant risk of developing necrotising enterocolitis, yet nevertheless marketed its product as safe and effective for premature infants.~~
~~Defendant intentionally misrepresented that cow-based products are safe for premature infants.~~
~~Defendant intentionally misrepresented that cow-based products are necessary for optimum growth.~~
~~Defendant intentionally misrepresented that cow-based products are similar or equivalent to human milk.~~
~~Defendant intentionally used the brand "Human Milk Fortifier", which suggests to average consumers that the product was derived from human milk.~~
~~Defendant intentionally advertised in a massive fashion in order to create a stigma around breastfeeding.~~
~~Defendant intentionally made it difficult for physicians to urge the use of breastmilk by creating a false sense that non-breastfeeding moms were being judged and stigmatized.~~

bb. ~~The aforementioned misrepresentations were the proximate cause of Baby Aries getting NEC, and the proximate cause of his death.~~

G.E.    Breach of Express Warranties

a. The allegations contained in previous paragraphs set forth specific representations Abbott has made to consumers, physicians and medical staff through its advertising and promotional materials (some of which are actually inserted above).  The allegations contained in those paragraphs are incorporated herein.  Upon information and belief said representations were made by Abbott on an ongoing and repeated basis, and specifically relevant here, at various points ~~between January 1, 2018 and February 22, 2018.~~prior to bovine products being fed.

b. Defendant expressly warranted, through direct- to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated uses, including use by premature infants.

c. Defendant expressly warranted that its product was similar or equivalent to human milk.

d. Defendant expressly warranted that its product~~s~~ ~~was~~were necessary for "catch-up growth" of premature infants.

e. The Product did not conform to these express representations because they cause serious injury when used to feed premature infants and because the products were not necessary for catch-up growth.

f. The aforementioned breached warranties were the proximate cause of Baby Aries getting NEC, and the proximate cause of his death.

H.F.    Reckless Disregard—Punitive Damages

The allegations contained in previous paragraphs set forth specific representations Abbott has made to consumers, physicians and medical staff through its advertising and promotional materials (some of which are actually inserted above).  The allegations contained in those paragraphs are incorporated herein.  Upon information and belief said representations were made by Abbott on an ongoing and repeated basis, and specifically relevant here, at various points between January 1, 2018 and February 22, 2018.

    a.   In violation ofPursuant to Conn. Gen. Stat. Section 52-240b plaintiff seeks punitive damages in that the defendant was reckless in that it continued to market and sell its cow's milk-based products to premature infants when it knew its product was causing death and NEC in these babies; and/or

    b.   Intentionally ignored or avoided the more recent scientific data and studies concluding that its product was causing NEC and death so that it could continue to profit from the sale of its product; and/or

    c.   Intentionally failed to take protective measures it knew would save premature infants from developing NEC and/or dying; and/or

    d.   Intentionally allowed NICUs, hospitals, and doctors to utilize different feeding strategies instead of developing an evidence based nationwide safety plan to prevent its product from causing NEC and death in premature infants; and/or

    e.   Continued to claim its product was beneficial to the growth of extremely premature infants when it knew its cow's milk-based product was unnecessarily causing NEC and death in these babies; and/or

    f.   Deliberately withheld important data to the FDA that its product was causing NEC and death in premature infants; and/or

    g.   Failed to promote human based milk and instead continued to promote its dangerous cow's milk-based product for premature infants because it did not have a human based product it could sell.

    ——Designed an intentional and reckless marketing campaign designed to deceive parents and healthcare providers regarding the safety and necessity of their products.

COUNT TWO- INTENTIONAL MISREPRESENTATION

    1-152. Plaintiff incorporates by reference paragraphs 1-152 of the preceding paragraphs as if fully set forth herein.

153.    The allegations contained in previous paragraphs set forth specific representations Abbott has made to consumers, physicians and medical staff through its advertising and promotional materials (some of which are actually inserted above).  The allegations contained in those paragraphs are incorporated herein.  Upon information and belief said representations were made by Abbott on an ongoing and repeated basis, and specifically relevant here, at various points between January 1, 2018 and February 22, 2018.

154.    The defendant knew that its representations claiming its products were safe were false.

155.    The defendant knew that its product placed premature infants at significant risk of developing necrotizing enterocolitis, yet nevertheless marketed its product as safe and effective for premature infants.

156.    Defendant intentionally misrepresented that cow's milk-based products are necessary for optimum growth.

157.    Defendant intentionally misrepresented that cow' s milk-based products are similar or equivalent to human milk.

158.    Defendant at all relevant times knew, based on existing studies, that marketing of formula negatively impacts a mother's decision to lactate and produce her own milk.

159.    Despite knowing that cow milk based formula is not a suitable alternative to breastmilk, Defendant has marketed its product as a suitable alternative.

160.    Despite knowing that cow's milk based products are not necessary to the ade-

quate growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

161.   Despite knowing that cow's milk based products are not necessary to the adequate growth of a premature infants, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

162.   Despite knowing that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to moms and dads as necessary for "catch-up growth" for premature infants.

163.   Despite knowing that exclusive human milk nutrition is sufficient on its own to accomplish necessary growth of a premature infant, Defendant has marketed its product to physicians and medical staff as necessary for "catch-up growth" for premature infants.

164.   Baby Aries' mother was exposed to some of the marketing described in "the marketing" section above portraying cow's milk--based products as a reasonable alternative to breastmilk.

165.   Baby Aries' mother was exposed to some of the marketing described in "the marketing" section above portraying cow's milk--based products as necessary for premature infants for "catch-up growth".

166.   Baby Aries mother was enticed into joining *Similac Strong Moms Rewards*, which entices mothers with coupons, other gifts, and what Abbott claims is "nutrition guidance for you and your baby".  Once a mother joins this group, Abbott gains access and knowledge

about the member, all which Abbott uses to more effectively and in targeted fashion persuade the user towards its products and misinform the user of the purported benefits of the product.

167.   Anika Hunte was enticed by the coupons, the gifts and the belief she would receive valuable educational material as a result of her membership in *Similac Strong Moms.*  As a result of this membership, Abbott gained access to substantial private information that helped Abbott target its marketing efforts at Anika Hunte.  For example, Abbott was aware that Anika Hunte was pregnant and that she was in her 27th week, getting ready to enter her third trimester.

168.   On January 18, 2018, Anika Hunte, was hospitalized, expecting the premature birth of Baby Aries.  At this time, she was aware that she was imminently to deliver an extremely premature baby.  She was mentally and physically exhausted, and was particularly susceptible to influence, disinformation and deception.  On said date, while hospitalized, Anika Hunte received an email from Abbott (Similac StrongMoms).  The email was designed to build a relationship with the expectant mother and instill trust in Similac products.  The email contains various links which are designed to message the quality of Abbott's brands and control the message regarding the nutritional needs of babies.

169.   As a result of the marketing described above, Baby Aries' mother was caused to believe that formula was a suitable alternative to breast milk.  This belief was a substantial factor in the baby consuming this dangerous product, which, in turn, was a substantial factor in the baby developing Necrotizing Enterocolitis and death.

170.   As a result of the marketing described above, Baby Aries' mother was caused to believe that formula was safe for premature infants.  This belief was a substantial factor in the

62

baby consuming this dangerous product which, in turn was a substantial factor in the baby developing Necrotizing Enterocolitis and death.

171.    As a result of the marketing described above, Baby Aries' mother was caused to believe that formula was necessary for the growth of the premature infants.  This belief was a substantial factor in the baby consuming this dangerous product which, in turn was a substantial factor in the baby developing Necrotizing Enterocolitis and death.

172.    As a result of the marketing described above, Baby Aries' mother was rendered misinformed, and/or less motivated and/or less determined to insist that her baby be provided exclusively human milk.  This belief was a substantial factor in the baby consuming this dangerous product which, in turn was a substantial factor in the baby developing Necrotizing Enterocolitis and death.

173.    As a result of the marketing described above, Baby Aries' mother was rendered misinformed and/or less motivated and/or less determined and was rendered less capable to resist the decision of her physicians to feed her baby cow's milk–based products.

174.    As a result of the marketing described above, Baby Aries' mother was rendered less capable of providing informed consent regarding the care and nutrition of her child.

175.    As a result of the marketing described above, Baby Aries' mother was rendered a less effective advocate for the medical decisions being made for her child.

176.    Defendant's marketing campaign was designed to increase profit.  Formula is in direct competition with mother's milk.  Causing mothers to decrease lactation consequently

causes increased market share and greater revenues.

177.    Causing mothers to believe that bovine products are suitable alternatives to breast milk causes a greater likelihood that a mother will purchases bovine products.

178.    Causing mothers to believe that bovine products are safe will increase the likelihood that a mother will purchase bovine products.

179.    Defendant's marketing campaign targeting new babies was willful, in that defendant knows that once a baby begins a formula diet, a mother rarely returns to lactation.

180.    Defendant's marketing campaign targeting new babies was willful, in that defendant knows that once a baby is fed a particular brand, there is strong brand loyalty which will result in extended revenues over the course of years.

181.    Defendant's marketing was willful and with reckless disregard and was motivated by a desire to not lose market share to lactation.

182.    Defendant's improper marketing was in direct violation of the Code, and recklessly ignored the known consequences of direct to consumer marketing, specifically that direct to consumer marketing has the known effect of lowering lactation and exclusive human milk nutrition.

183.    Defendant has developed a product line that is intended to "hook" children at the start of their life with the intent to maintain brand loyalty through nursing and into the toddler years.

184.    Defendant has chosen profit over safety.

18 5.    Defendant purports to encourage lactation but its marketing uses subtle and devious techniques to accomplish the opposite.

## COUNT THREETWO – VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT

1 1201 117.    This Count is not based on any claim that the Defendant's product was defective or unreasonably dangerous.

Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

2.    Defendants engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

   a.   By developing a systematic, pervasive, deceptive, fraudulent effective and manipulative marketing scheme designed to make moms believe the formula and other cow's milk-based products were equal to or superior to as safe, or even safer, than human milk, and more particularly that it was safe for premature infants;

   b.   By developing a scheme to persuade and incentivize physicians and hospitals to use cow milk products;

   c.   By developing a scheme to persuade physicians that cow's-milk based products are necessary;

   d.   By aggressively lobbying government officials to not adopt the Code;.

e. By engaging in direct--to--consumer marketing-, despite knowing that the likely effect of this marketing would result in a decrease in lactation;

f. By developing a marketing scheme designed to create a perception that any effort by medical staff to encourage breastfeeding is a form of inappropriate and negative judgment;.

g. By purporting to support the Code while actually undermining and disobeying its key provisions;

h. Through advertising, promotion and marketing, inducing mothers of premature infants to not breastfeed by diminishing the public perception of the importance of breastfeeding, and placing formula feeding on an equivalent level - i.e. marketing "personal choice" at the expense of sound medical choice;

i. While outwardly purporting to support breastfeeding, devised a marketing campaign which was actually designed to diminish breastfeeding;

j. Concealing the risks of NEC associated with the use of cow milk by premature infants;

k.j. Eengaging in an industry-wide scheme to defraud consumers and physicians into believing that there is a bona fide scientific dispute regarding whether bovine products are necessary to achieve necessary growth and nutrition in premature infants;

A. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

B.   ~~Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or mis-~~

~~understanding;~~

~~a.~~k.Expending enormous amounts of money on political lobbying, political in-

volvement, "donations" to hospitals, and medical associations, all designed to

protect their financial interests: ensuring that the Government does not suffi-

ciently promote ~~the dangers of Formula versus~~advantages of breastmilk ver-

sus formula; that direct advertising of infant formula is not prohibited in the

United States; and preventing aggressive federal regulation of formula.  These

expenditures were made from a profit motive, and in direct conflict with the

interests of society, and babies in particular;

~~b.~~l. Intentionally marketed breastfeeding moms as having unappealing character-

istics, in order to cause mothers to not breastfeed;

~~c.~~m.              Paid "mommy bloggers" to give positive reviews of their

product, when they knew this would have the effect of causing moms to be-

lieve the reviews were genuine, and thus inducing moms to buy their prod-

ucts;

~~d.~~n.Supported and financed medical research designed to create doubt in the pos-

sibility of an exclusive human milk diet in premature infants;

~~e.~~o.Through money contributions, endeared itself to the medical profession in or-

der to win favor over the medical profession;

~~f.~~p. Through its marketing campaigns, created an environment where moms

would resist any advice from medical professionals to breastfeed.

3.    Defendant intended for parents and medical staff to rely on its representations, manipulations, and advertisements regarding the Products in order to achieve monetary gain from sale of their Products.  Abbott has spent millions and millions of dollars in promotion, advertising, lobbying, gifts, and "charitable donations" all designed to maintain an image that its product is safe, and effective and necessary , despite knowing the opposite to be true, and all for the purpose of securing profits in an incredibly lucrative industry.

4.    Despite publicly expressing a commitment to breastfeeding, Defendant designed and executed promotional campaigns which discourage or reduce breastfeeding, thus allowing Abbott to capture greater market share and deliver greater profits to their stockholders.

5.    As a result of the unfair trade practices engaged in by the Defendant Abbott, Baby Aries was injured and killed by the cumulative nature of Defendant's conduct. The cumulative effect of Defendant's conduct directed at parents and other consumers was to create demand for and sell the Products. Each aspect of Defendant's conduct combined to artificially create sales of the product, to deceive the public at large, the medical community and Baby Aries' parents in particular.

122.    Defendant has a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

6.    Had Defendant not engaged in the deceptiveintentional, deceptive, unconscionable, immoral, and fraudulent conduct described above, Baby Aries would not have been fed the dangerous product, and would not have incurred related injuries and damages.  Specifically,

were it not for the intentional, deceptive, unconscionable, immoral, and fraudulent conduct described above: (1) physicians would not likely have provided the products that harmed and killed baby Aries; (2) mothers, and Anika Hunte in particular would not have permitted that Baby Aries be fed the products that harmed and killed Baby Aries; and (3) Anika Hunte would have been more vigilant of what was being fed to her baby, and she would have prevented the products from being fed to her baby, and therefore would have prevented the injury and death to her child.

7. Defendant's intentional, deceptive, unconscionable, immoral, and fraudulent representations and material omissions to Baby Aries' parents, physicians, and consumers, constituted unfair and deceptive acts and trade practices in violation of the Connecticut Unfair Trade Practices Act.

8. Defendant's actions, as complained of herein, constitute unfair competition or unfair, unconscionable, immoral, unscrupulous, deceptive or fraudulent acts, or trade practices in violation of the Connecticut Unfair Trade Practices Act.

9. Defendant has engaged in unfair competition or unfair or deceptive acts or trade practices, or have has made false representations in violation of the Connecticut Unfair Trade Practices Act.

12927. Defendant violated the statutes that were enacted in Connecticut to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that Defendant's Products were fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and

by other acts alleged herein. These representations were made in marketing and promotional ma-

terials.

~~130~~28. Defendant had actual knowledge of the defective and dangerous condition of De-

fendants' product and failed to take any action to cure such defective and dangerous conditions.

10. Baby Aries' pPhysicians and medical staff relied upon Defendants' misrepresen-

tations and omissions in determining which product to use.

11. Baby Aries' parents were deceived into not objecting to Defendant's products by

virtue of Defendant's misrepresentations and omissions and deceptive marketing campaigns.

12. Abbott's deliberate misrepresentations and omissions about the equivalence

and/or superiority of its cow's milk-based product use was further intended to affect the deci-

sions of consumers (parents) to buy Similac products and thereby affect the price of those prod-

ucts. As a result of the defendant's deliberate misrepresentations and omissions as stated above,

Abbott unfairly and deceptively maintained the high-price of its Similac product at an inflated

level not otherwise attainable and caused the consuming public to pay more for the Similac

products that they purchased than was warranted or than they would have otherwise paid in the

absence of these deliberate misrepresentations and omissions.

13. Abbott's pervasive marketing of its Similac products with deliberate misrepresen-

tations and omissions about the equivalence and/or superiority of its cow's milk-based products

was intended to affect the decisions of consumers to purchase Similac products. As a result of

the defendant's deliberate misrepresentations and omissions stated above, Abbott unfairly and

deceptively maintained the high price of its Similac products at inflated levels not otherwise ob-

tainable and caused the consuming public to pay more for Similac than they would have otherwise paid in the absence of these deliberate misrepresentations and omissions.

14.    Abbott's wrongful scheme to promote and market its products has created significant financial loss to the consumers and improperly discouraged the use of mother's milk or donor milk.

15.    As a further result, the wrongful scheme of over-promoting Similac products in the NICU for free or at a reduced cost with deliberate misrepresentations and omissions about its the equivalence and/or superiority of its cow's milk-based products, in order for the parents to ultimately purchase the products when their child leaves the NICU, has created extensive medical bills and financial loss to the parents and/or to the State of Connecticut, because the products were a substantial factor in the premature infant developing necrotizing enterocolitis, undergoing surgeries, and increased hospitalization costs.

16.    By reason of the unlawful acts engaged in by the Defendant, and as a direct and proximate result thereof, Baby Aries and his estate, suffered ascertainable losses and damages in the form of: (a) lost wages; (b) funeral and burial expenses; (d) medical bills and costs.

17.    By reason of the unlawful acts engaged in by the Defendant, and as a direct and proximate result thereof, Baby Aries and his estate, suffered ascertainable losses and damages because the available breast milk, which was free to Baby Aries' mother, was replaced in part by expensive cow's milk products manufactured and sold by the Defendant.

18.    Additionally, Baby Aries suffered Noneconomic losses including physical and mental pain and suffering, emotional distress, while living; and Death.

19.      Plaintiff is entitled to punitive damages pursuant to Conn. Gen. Stat. §42-110g(a) because defendant's conduct was reckless as set forth in the preceding paragraphs.

COUNT FOUR- LOSS OF FILIAL CONSORTIUM - ANIKA HUNTE

1.      Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

2.      Loss of filial consortium is a derivative claim.  It is derivative of each of the claims and allegations above.

3.      At all relevant times Anika Hunte was the lawful mother of Baby Aries.

4.      As a result of the tortious conduct of the defendant, Abbott Laboratories, Inc., the plaintiff, Anika Hunte, suffered a loss of affection, companionship, society and consortium of her son Aries Peterson.

COUNT FIVE- LOSS OF FILIAL CONSORTIUM - DANE PATERSON

1.      Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

2.      Loss of filial consortium is a derivative claim.  It is derivative of each of the claims and allegations above.

3.      At all relevant times Dane Peterson was the lawful father of Baby Aries.

4.      As a result of the tortious conduct of the defendant, Abbott Laboratories, Inc., the plaintiff, Dane Peterson, suffered a loss of affection, companionship, society and consortium of his son Aries Peterson.

WHEREFORE, Plaintiff demands:

a)      Fair, just and adequate money damages;
b)      As to the reckless allegations, punitive damages up to twice the damages pursuant to 52- 240b;
c)      Attorneys fees;
d)      Punitive Damages pursuant to Conn. Gen. Stat. §42-110g(a);
e)      Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues and causes of action.


Dated:  ~~October 28, 2020~~February 26, 2021



By: _____

Jose Rojas, Esq.

Levin, Rojas, Camassar & Reck, LLC

40 Russ Street

Hartford, CT  06106

(860) 860-232-3476